Merrimack, }
Dec. 4, 1906. }

THOMPSON, *Ex'r*, *v.* KIDDER *& a.*

The statute imposing a tax upon collateral legacies and successions (Laws 1905, *c.* 40) is not in conflict with the constitution.

BILL IN EQUITY, by the executor of the will of James Thompson, alleging that by the terms of chapter 40, Laws 1905, legacies given by said will to each of the defendants are subject to a tax of five per cent, which it may be the duty of the plaintiff to pay. The defendants claim that said chapter is unconstitutional; and upon this question the plaintiff asks the instruction of the court. By leave of court, the attorney-general appeared for the state. The facts alleged in the bill were found to be true, and the case was transferred from the October term, 1905, of the superior court, by *Pike*, J.

Section 1, chapter 40, Laws 1905, is as follows: "All property within the jurisdiction of the state, real or personal, and any inter-

est therein, whether belonging to inhabitants of the state or not, which shall pass by will, or by the laws regulating intestate succession, or by deed, grant, sale, or gift, made or intended to take effect in possession or enjoyment after the death of the grantor, to any person, absolutely or in trust, except to or for the use of the father, mother, husband, wife, lineal descendant, brother, sister, adopted child, the lineal descendant of any adopted child, the wife or widow of a son, or the husband of ·a daughter, of a decedent, or to or for the use of charitable, educational, or religious societies or institutions in this state the property of which is by law exempt from taxation, or to a city or town in this state for public purposes, shall be subject to a tax of five per cent of its value, for the use of the state."

*Streeter & Hollis* filed a brief, and *Mr. Streeter* argued orally, in opposition to the tax.

*Edwin G. Eastman,* attorney-general, and *Joseph S. Matthews,* by brief and orally, for the state.

PARSONS, C. J.   " The public charges of government or any part thereof may be raised by taxation upon polls, estates, and other classes of property, including franchises and property when passing by will or inheritance."   Const. [1903], *art.* 6.   The main argument of the opponents of the tax is in support of the contention that any inheritance tax violates well known constitutional principles.   It is not claimed that the language of article 6, as it now stands, is not sufficient to authorize legislation of this character; but the contention is that such action is contrary to the requirements of other provisions of the instrument, namely, article 12 of the bill of rights,—" Every member of the community has a right to be protected by it in the enjoyment of his life, liberty, and property.   He is, therefore, bound to contribute his share in the expense of such protection,"—and the provision of article 5, part second, granting "full power and authority " to the general court " to impose and levy proportional and reasonable assessments, rates, and taxes upon all the inhabitants of, and residents within, the said state, and upon all estates within the same."   It is claimed that an inheritance tax is of necessity disproportional and in that sense unequal, does not provide for an equal division of public expense, and is contrary to the special provisions cited, as applied in a long line of decisions of this court.   This claim has the support of the decision in *Curry* v. *Spencer,* 61 N. H. 624, and for the purposes of the discussion will be considered sound. The contention then is that the constitution as it now stands is

inconsistent and self-contradictory—that a method of defraying
public charges expressly authorized by one of its provisions is for-
bidden by implication by others.   While the constitution as it now
stands is to be considered as a whole as if enacted at one time
(*Drew* v. *Tifft*, 79 Minn. 175,—79 Am. St. Rep. 446), to ascertain
the meaning of particular expressions it may be necessary to give
attention to the circumstances under which they became parts of
the instrument.   The whole is to be considered, and the true
meaning to be drawn from the consideration of every part.   Aid
in ascertaining the meaning of the provisions adopted in 1783 and
of those introduced in 1903 is to be found in the circumstances
surrounding the adoption of each.   "Our system of taxation origi-
nated, as in all the New England states, in the condition and cir-
cumstances of the early settlers of the country, and the nature and
character of the general mass of their property. . . . It con-
sisted mainly in lands, buildings, and cattle, visible and tangible
property open to observation.   The amount of property and the
pecuniary condition of each citizen were generally known in his
neighborhood.   Business transactions were limited in amount and
magnitude, and of a direct and simple character, with none of the
complications incident to banking, trade, commerce, and manufac-
tures of the present day.   To tax visible, tangible property was
substantially to tax the entire property of the community. . . .
There was but little if any occasion, therefore, to inquire into the
principles of political economy upon which a system of taxation
should be founded.   As all citizens were understood to enjoy the
equal protection of government, in life, liberty, person, and prop-
erty, and the equal benefits of its institutions, the apparently equi-
table rule, that all should contribute proportionally to the public
charges by direct tax upon polls and estates, came to be considered
in our provincial and early state history as the true theory of tax-
ation."   Report of Judge Sawyer, Chairman of Tax Commission-
ers, 1876, *p.* 9.

 · "The definition of taxation, given in the foundation, is taken
from books with which the leading statesmen of the Revolution
were familiar."   *State* v. *Express Co.*, 60 N. H. 219, 250.   The inevi-
table deduction from the theory of taxation understood by the
parties to the contract, recognized and adopted by the express
terms of the governmental agreement, is that "the obligation of
each to contribute 'his share' requires an equal division. . . .
Every one's tax being his share of public expense, an unequal
division of that expense is not taxation."   *State* v. *Express Co.*,
*supra*, 251.   Any scheme for a disproportional division of public
expense is not taxation, as understood by the parties to the com-
pact of 1783.   *Winkley* v. *Newton*, 67 N. H. 80, 81; *Curry* v.

*Spencer*, 61 N. H. 624, 632; *Boston etc. R. R.* v. *State*, 60 N. H. 87, 94. Taxation of the people of the state, " by New Hampshire law, . . . is a division among themselves of the expense of their own government of themselves—a division made by themselves through their own agents, in pursuance of their original contract." *Edes* v. *Boardman*, 58 N. H. 580, 589. The rules prescribed to be followed in making the division are not the only rules that could be provided. *State* v. *Express Co.*, 60 N. H. 219, 256, 257. Though proportion is the rule, an intention to subject themselves to disproportion in all or some of the details of defraying public charges can be proved " by an express stipulation of the contract, or other competent evidence." *Ib.* 255.

However equitable as an abstract proposition and logically correct in principle the rule of the compact of 1783 may be, or however just it proved in practice as applied to conditions then existing, the practical operation of that rule in promoting justice and prosperity under conditions developed by the changes of one hundred and twenty years in the manners, customs, habits, and possessions of a people is at least a question open to debate. The science of government was not exhausted by the writers who preceded the Revolution, nor did the principles laid down by them and adopted by the fathers conclude further thought upon the subject of taxation. It has been suggested since then that a government should impose such a tax as is " easily assessed and collected, and is at the same time most conducive, all things considered, to the public interests." McCullough on Taxation 19 (1844). " Equality of taxation, therefore, as a maxim of politics," says Mill, " means equality of sacrifice. It means apportioning the contributions of each person towards the expenses of government, so that he shall feel neither more nor less inconvenience from his share of the payment than every other person experiences from his." Mill Pol. Econ., *bk.* 5, *c.* 2, *s.* 2. Or, as stated by Adam Smith: " The subjects of every state ought to contribute towards the support of the government, as nearly as possible, in proportion to their respective abilities; that is, in proportion to the revenue which they respectively enjoy under the protection of the state." Wealth of Nations, *bk.* 5, *c.* 2, *pt.* 2. See Fawcett Pol. Econ., *bk.* 4, *c.* 1; 23 Enc. Brit. (9th ed.) 85. There is evidence that this was the equality sought by the framers of the constitution. Judge Sawyer's Report 9, 10, citing acts of April 12, 1770, and January 2, 1772, in which the object of the legislature was declared to be " that every person may be compelled to pay in proportion to his income." But the questions whether an annual distribution of public expense in proportion to the property of each taxpayer is the most equitable method,—whether in that or some other way

the public charges can be met so as to be least of a burden to the people,—are questions of economics not open in a judicial forum,. but properly considered and determined in a convention of the people engaged in arranging the terms of the social compact and settling the fundamentals of government.

While an inheritance tax, or death duty, has been recognized as. a method of governmental support from very early times, it was practically unknown in England at the time of the Revolution, but has since that time been in use there and more recently has been adopted in many of the states. *Curry* v. *Spencer*, 61 N. H. 624, 632; *Magoun* v. *Bank*, 170 U. S. 283, 287, 288. The number of these statutes and the judicial ingenuity that has been displayed in supporting them attest the favorable opinion with which the political wisdom of this method of distributing the governmental burden is now regarded; but the decisions themselves, involving as they do consideration of the provisions of particular constitutions, are not of value in the present discussion, except as they may throw light upon the nature of the tax sought to be imposed and the situation in view of which the convention and the people acted in 1903. All the decisions agree, as was held in effect in *Curry* v. *Spencer*, that an inheritance tax is not a proportional distribution of public expense upon the property of the taxing district. "Taxes of this general character are universally deemed to relate, not to property *eo nomine*, but to its passage by will or by descent in cases of intestacy, as distinguished from taxes imposed on property real or personal as such, because of its. ownership and possession. In other words, the public contribution which death duties exact is predicated on the passing of property as the result of death, as distinct from a tax on property disassociated from its transmission or receipt by will, or as the result of intestacy. . . . Tax laws of this nature in all countries rest in their essence upon the principle that death is the generating source from which the particular taxing power takes its being, and that it is the power to transmit, or the transmission from the dead to the living, on which such taxes are more immediately rested." *Knowlton* v. *Moore*, 178 U. S. 41, 47, 56. Whether governmental taking of the property of the individual in this way is properly described as an excise, commodity, succession, or privilege tax is not material. No language of the constitution authorizes taxation by such terms, and it would avail nothing to establish the definitive accuracy of either. The constitution in terms authorizes what the statute attempts to effect. Under such circumstances the discussion of questions of terminology is unnecessary and may be misleading. *Knowlton* v. *Moore*, 178 U. S. 41, 57. Such a proceeding is merely a taking for governmental pur-

poses of a portion of the estate at the death of the owner. If the right of property previously enjoyed embraced the right to dispose of it after, or in view of, death, the authorization of such taking is a limitation upon that right. *Crocker* v. *Shaw*, 174 Mass. 266, 267 ; *Emmons* v. *Shaw*, 171 Mass. 410, 413; *Minot* v. *Winthrop*, 162 Mass. 113, 124; *United States* v. *Perkins*, 163 U. S. 625, 628.

If at the making of the social compact the right of property, as then understood and reserved, did not include any right of control over it at death,—if the property right was merely a life estate, remainder in the survivors united in the corporate organization called the government,—any power of testamentary disposition would be a grant from the many to the individual, a privilege which could be incumbered, limited, withdrawn, 'or regulated at will. If by natural right, or preëxisting compact, the right of property enjoyment does, or does not, include the untrammeled power of disposition at death, the parties in revising or renewing the governmental compact may by mutual agreement add to, or detract from, the nature of the right. It might be agreed that all property on the death of the owner should be the property of the survivors. All inheritable quality might be taken from the conception of property as now understood. While such taking or such right of survivorship, if limited in amount and for use for public purposes, would possess some of the elements of a tax, it would lack fundamental elements of taxation as understood in this state from 1784 to 1903. It would be an application of property for public charges, but not a proportional division of public expense.        ··

The sole question, therefore, is whether in 1903 the people intended to provide, in addition to taxation as hereto defined and understood, a different method for meeting public charges by the exaction for that purpose of part of the property of the individual upon his death. The express language is admittedly sufficient for the purpose. The only adverse argument urged is the failure to introduce express limitations of the provisions requiring proportion and equality in the distribution of the public burden. But the evidence ·is very clear that the intent was to authorize such taxation. The fact that such method of defraying governmental expense was not within the terms of the existing social compact as judicially defined, the growing favor with which such method was with almost entire uniformity regarded in other jurisdictions, the well understood need of additional sources of revenue to defray the increasing state expense, render certain that the purpose of the action upon the subject was to grant a power not understood to be given by the existing compact. The language used,—" property when passing by will or inheritance,"—similar

in form with the language of the statute, which is identical with the Massachusetts statute (Mass. R. L., *c.* 15, *s.* 1), indicates that to make clear that the desired power was granted language similar to that used elsewhere in imposing the tax was employed. The question submitted to the people and upon which they voted was: "Do you approve of empowering the legislature to impose taxes, not only upon polls and estates, but also upon other classes of property, including franchises and property when passing by will or inheritance, as proposed in the amendment to the constitution?" This proposition having been adopted by the requisite constitutional majority, it is impossible seriously to maintain that it was not intended to so amend the constitution as to permit the taxation of "property when passing by will or inheritance."

The only position left is, that though the people intended to so amend the instrument which evidenced their governmental agreement, they failed to express their purpose because they omitted to negative in express terms in this particular the general intent of the document. "The rule, that the general intent appearing shall control the particular intent, must sometimes give way, and effect be given to a particular intent plainly expressed in one part of the constitution, though apparently opposed to a general intent deduced from other parts. . . . The people having voluntarily agreed with each other to form themselves into a body politic, the legal meaning of the written agreement is their intention and understanding shown by competent evidence." *State* v. *Express Co.*, 60 N. H. 219, 235, 255. Of their meaning the evidence leaves no room for doubt. Article 6, as it stood before the amendment,—"And, while the public charges of government or any part thereof shall be assessed on polls and estates in the manner that has heretofore been practiced, in order that such assessments may be made with equality there shall be a valuation of the estates within the state taken anew once in every five years, at least, and as much oftener as the general court shall order,"—while assuming that only polls and estates were proper subjects of taxation, was intended to secure proportional assessments by requiring frequent revaluations. The main purpose of the amended article is to declare the subjects of taxation. Logically, in its main purpose article 6 might now perhaps more properly stand as an addition to article 5, devoted to an enumeration of powers granted to the general court. But the mere position of the clause is not decisive of its meaning. If any subject or method of taxation specifically permitted cannot conform to some other condition of the constitution, the reasonable conclusion is that the particular condition was not understood to apply to the special method—not that it was intended that no effect should be given to the express language.

Conceding that an inheritance tax is necessarily disproportional, that it is unequal in its lack of proportion, and that it is impossible to lay a proportional tax upon property upon the occasion of death, it cannot have been understood that such impossibility would defeat the express power to lay such a tax, but it must follow that the express authority to impose such a tax is an authority to disregard the general rule of proportion so far as is necessary to exercise the power. Poll taxes are recognized in the constitution and have been imposed since before its adoption. They are not proportional; that is, the amount of the tax has no reference to the ability of the taxpayer to make payment. *Amoskeag Mfg. Co.* v. *Manchester*, 70 N. H. 336, 346. Poll taxes are constitutional because recognized by the constitution, and have never been understood to be rendered unconstitutional by their lack of proportion to the ability to pay. There is no more reason to conclude that the power to impose an inheritance tax, expressly given, is abrogated by a necessary lack of proportion also attaching to such a tax. Neither is it necessary to conclude, because by amendment an additional disproportional tax has been authorized, that it was intended to abrogate the fundamental rule of equal rights or the general rules of equality and proportion as to other taxes. All taxes that can be made proportional must be so assessed. The impossibility of assessing an inheritance tax in proportion permits such a tax to be otherwise laid. If to the words authorizing the imposition of inheritance taxes a clause had been added, in substance " without regard to the rule of proportion otherwise required in taxation," such clause would have furnished evidence of the constitutional intent; but the meaning being clear from competent evidence, the purpose is equally as certain and well established as it would have been by the use of such language. The purpose to authorize such a tax being clear, the intent to avoid any existing provision contrary thereto follows. It is the ordinary rule that a condition repugnant to a grant is void because it cannot be inferred it was intended to make a useless grant. It is not probable that it was intended to grant the power and at the same time to affix a condition rendering its exercise impossible.

But although the power to impose an inheritance tax is clear, it must be exercised so far as possible in accordance with all other provisions of the constitution. It must be an equal tax in the sense that it must affect all persons equally. In the present law all property taxed is taxed at the same rate, and the difficulty found in some cases with exemptions of a certain amount of property and with a tax varying according to the amount of property does not appear. But it is claimed that the tax is unequal in

that it is not assessed upon all property passing by will or inheritance. In Minnesota, under a constitutional provision authorizing the taxation of all inheritances, this was considered to be a fatal objection. *Drew* v. *Tifft*, 79 Minn. 175,—79 Am. St. Rep. 446; *State* v. *Bazille*, 87 Minn. 500,—94 Am. St. Rep. 718. But the equality of the constitution is an equality of right—not of enjoyment. *State* v. *Aldrich*, 70 N. H. 391; *State* v. *Dow*, 70 N. H. 286. "A law that confers equal rights on all citizens of the state, or subjects them to equal burdens, . . . is an equal law." *State* v. *Griffin*, 69 N. H. 1, 29, 30. Whether the tax is considered as an impairment of the right of property by incumbering the right to dispose of it at death, or as a tax upon the privilege of succeeding to property at the death of the owner, it affects all citizens alike. All who own property have the same privilege of disposing of it free from any incumbrance, and the right of all to pass it to those not within the exception is subject to the same imposition. Similarly, all have an equal right to inherit if within the exception, and are equally chargeable if not.

In *Curry* v. *Spencer*, 61 N. H. 624, 631, 632, it was urged that the similar statute (G. L., c. 64; Laws 1879, c. 57, s. 16) could be upheld as a means of distributing the expense of maintaining probate courts; but the contention was overruled upon the ground that if the law was to be regarded as imposing taxes solely for this purpose it was unequal, because some estates were required to contribute toward this expense while others were not. As a law solely for such purpose, the law was unequal because the right then in question was the right to the privileges of the probate court for purposes of administration. If one estate was entitled to be there settled without payment of fee, all were. *State* v. *Gorman*, 40 Minn. 232,—2 L. R. A. 701. In view of the change of the constitution, it is unnecessary to consider whether the present statute could be sustained upon the ground of contribution for probate expense. There are good reasons why the passing of property to near relatives, or the gift of it to charitable purposes or directly to the public, should not be subject to an exaction by the state. *Minot* v. *Winthrop*, 162 Mass. 113, 123; *Nunnemacher* v. *State*, 129 Wis. 190. The rule in this state has been that only such property was to be taxed as was included in the description of the property required to be taxed. The reasonable exemption of certain classes of property by express language, or by its omission from the description of the property required to be taxed, has not, in the practical construction given to the constitution ever since its adoption, been considered to affect the validity of the tax upon other property. *Brewster* v. *Hough*, 10 N. H. 138, 142; *Phillips Academy* v. *Exeter*, 58 N. H. 306; *Opinion of the Court*, 58

N. H. 623; *Opinion of the Justices*, 70 N. H. 642. The exemption does not render the assessment unreasonable, and it is not suggested that on any other ground the statute violates that requirement of the constitution. As the assessment in question is neither unequal nor unreasonable, and as its disproportion to the taxation of other property, inherent in the tax itself, must have been contemplated by the people in their special authorization of this tax, the conclusion is, that in so far as the question is determined by the power of the legislature to enact a collateral inheritance tax law, the tax imposed under chapter 40, Laws 1905, is valid, and the executor is advised to make payment in conformity thereto. For the purpose of obtaining a decision of the question all objections to the form of the proceedings were waived.

*Case discharged.*

All concurred.