Strafford,  
Cheshire,  
June 26, 1924.

MARY E. WILLIAMS & a., Ex'rs, Ap'ts, v. STATE.

HENRY KLOUS & a., Ex'rs, Ap'ts, v. SAME.

Laws 1919, c. 37, s. 1, imposing a graduated or progressive tax upon the property of decedents passing by will or intestate succession, is unconstitutional as in violation of the general constitutional principle that an equal division requires a proportional valuation of all property and the assessment of all at the same rate.

Where part of a statute is unconstitutional and it is impossible to tell what part the legislature would have adopted independently of the void part, the whole is void.

A valid act is not affected by the enactment of a void amendment, even if there are words of express repeal, unless it is clear that the legislature intended such repeal.

Laws 1915, c. 106, s. 1 was not repealed by the enactment of Laws 1919, c. 37, s. 1, the latter statute being void.

The federal estate tax (Laws 64th Cong., 1st Session, c. 463), being imposed upon the transmission of the net estate, falls *pro rata* upon each heir in cases of intestacy; if a will is silent on the subject, the tax should not all be imposed upon the residuary legatee but should be prorated among all the beneficiaries.

Under Laws 1915, c. 106, s. 1, stocks of foreign corporations and deposits in banking institutions outside the state are liable to taxation if the title thereto passes through executors, or the property in the course of administration comes within this jurisdiction.

Liberty bonds are to be considered in assessing the tax under Laws 1915, c. 106, s. 1.

TWO PROBATE APPEALS. The first case is an appeal from a decree dismissing a petition for abatement of taxes.

The second is an appeal from a decree approving an assessment made by the state treasurer. The taxes were assessed under chapter 40, laws of 1905 and the amendments thereof. The questions arising under the several assessments were in each case transferred, without a ruling, by *Allen*, J.

*Hughes & Doe (Mr. Doe* orally), for Williams & a.

*Roy M. Pickard* and *Philip H. Faulkner (Mr. Pickard* orally), for Klous & a.

*Joseph S. Matthews*, assistant attorney-general, by brief and orally, for the state.

*Homer Albers* (of Massachusetts) and *Snow & Cooper*, as *amici curiæ*, filed a brief and *Mr. Snow* argued orally in opposition to the assessments.

PARSONS, C. J. One case is an appeal from a tax assessment; the other is an appeal from a refusal to abate an assessment previously made. No question as to procedure is raised. The cases are transferred upon sundry inquiries as to the law in concrete form as applicable to particular facts, which it does not appear to be necessary to examine in detail.

The substance of the questions raised are:

(1) Are the provisions of section 1, chapter 37, Laws 1919, in conflict with the constitution?

(2) Should the federal estate tax be considered in assessing the state tax?

(3) (a) Are shares of stock in non-resident corporations and deposits in banks outside the state, or (b) liberty bonds, to be considered in making the assessment?

I. The main controversy is as to the power of the legislature to enact *s.* 1, *c.* 37, Laws 1919. After the adoption of the constitutional amendment in 1903 "empowering the legislature to impose taxes not only upon polls and estates, but also upon other classes of property, including franchises and property when passing by will or inheritance," the legislature in 1905 adopted "An act imposing a tax on collateral legacies and successions."

Section one of the act was subsequently amended so that at the date of the legislation, in 1919, it read as follows:

"Section 1. All property within the jurisdiction of the state, real or personal, and any interest therein, belonging to inhabitants of the state, and all real estate within the state, or any interest therein, belonging to persons who are not inhabitants of the state, which shall pass by will, or by the laws regulating intestate succession, or by deed, grant, bargain, sale, or gift, made in contemplation of death, or made or intended to take effect in possession or enjoyment at or after the death of the grantor or donor, to any person, absolutely or in trust, except to or for the use of the father, mother, husband, wife, brother, sister, lineal descendant, adopted child, the lineal descendant of any adopted child, the wife or widow of a son, or the husband of a daughter, of a decedent, or to or for the use of educational, religious, cemetery, or other institutions, societies, or associations of public charity in this state, or for or upon trust for any charitable purpose in the state, or for the care of cemetery lots, or to a city or town in this state for public purposes, shall be subject to a tax of five per cent. of its value, for the use of the state; and administrators, executors, and trustees, and any such grantees under a conveyance made during the grantor's life, shall be liable for such taxes, with interest, until the same have been paid. An institution or society shall be deemed to be in this state, within the meaning of this act, when its sole object and purpose is to carry on charitable, religious, or educational work within the state, but not otherwise." Chapter 106, section 1, Laws 1915.

The section now under consideration is:

"Section 1. All property within the jurisdiction of the state, real or personal, and any interest therein, belonging to inhabitants of the state, and all real estate within the state, or any interest therein, belonging to persons who are not inhabitants of the state, which shall pass by will, or by the laws regulating intestate succession, or by deed, grant, bargain, sale, or gift, made in contemplation of death, or made or intended to take effect in possession or enjoyment at or after the death of the grantor or donor, absolutely or in trust, to or for the use of the father, mother, husband, wife, lineal descendant, adopted child, the lineal descendant of any adopted child, the wife or widow of a son, or the husband of a daughter, of a decedent, shall be subject to a tax, for the use of the state, of one per cent. of its value up to $25,000; of two per cent. of its value in excess of $25,000 up to $50,000; of two and one-half per cent. of its value in excess of $50,000 up to $100,000; of three per cent. of its value in excess of $100,000 up to $250,000; and of five per cent. of its value in excess

of $250,000; but no bequest, devise or distributive share of an estate which shall so pass to or for the use of a husband, wife or of any such person who is under twenty-one years of age at the time of the decedent's death shall be subject to such tax, except upon its value in excess of $10,000; and all such property which shall so pass to or for the use of any other person, except educational, religious, cemetery, or other institutions, societies or associations of public charity in this state, or for or upon trust for any charitable purpose in the state, or for the care of cemetery lots or to a city or town in this state for public purposes, shall be subject to a tax of five per cent. of its value, for the use of the state; and administrators, executors, trustees and any such grantees under a conveyance made during the grantor's life, shall be liable for such taxes, with interest, until the same shall have been paid. An institution or society shall be deemed to be in this state, within the meaning of this act, when its sole object and purpose is to carry on charitable, religious, or educational work within the state, but not otherwise." Chapter 37, section 1, Laws 1919.

From a comparison of the two sections, it appears that by the act of 1919 property passing to brothers and sisters of the decedent upon which no tax was previously imposed is declared subject to a tax of five per cent. of its value and a tax is imposed upon property passing to other relatives also previously free from tax; the rate varying according to the value of the property passing with exemptions of considerable amount in certain cases.

The amendment of 1903 probably resulted from the decision in *Curry* v. *Spencer*, 61 N. H. 624 (1882), that the imposition of an inheritance tax was not within legislative power under the constitution as it then existed. Under the amendment, c. 40, Laws of 1905 was enacted. Section one of the act, except for verbal changes immaterial in the present inquiry, is identical with the law of 1915 above quoted. This act was sustained in *Thompson* v. *Kidder*, 74 N. H. 89, and is not now assailed by the appellants. The question raised is as to the validity of the classification by the value of the property passing and according to relationship to the decedent made in the act of 1919. No question as to the effect of the substantial exemptions has been raised or considered.

The state claims that the exaction by the state is an excise tax, if it is a tax; that in effect, rather than a tax, it is a provision for the disposition of property all of which belongs to the state at the death of the owner.

"If at the making of the social compact the right of property, as then understood and reserved, did not include any right of control over it at death, — if the property right was merely a life estate, remainder in the survivors united in the corporate organization called the government, — any power of testamentary disposition would be a grant from the many to the individual, a privilege which could be incumbered, limited, withdrawn, or regulated at will. If by natural right, or preëxisting compact, the right of property enjoyment does, or does not, include the untrammeled power of disposition at death, the parties in revising or renewing the governmental compact may by mutual agreement add to, or detract from, the nature of the right. It might be agreed that all property on the death of the owner should be the property of the survivors. All inheritable quality might be taken from the conception of property as now understood. While such taking or such right of survivorship, if limited in amount and for use for public purposes, would possess some of the elements of a tax, it would lack fundamental elements of taxation as understood in this state from 1784 to 1903. It would be an application of property for public charges, but not a proportional division of public expense." *Thompson* v. *Kidder*, 74 N. H. 89, 94.

"All men have certain natural, essential, and inherent rights, among which are the enjoying and defending life and liberty, acquiring, possessing, and protecting property." Bill of Rights, *art.* 2.

If in 1784 the power of testamentary disposition was no part of the conception of the property right, the state's contention would be well founded. The state has furnished nothing and nothing is found to sustain the idea that anyone claimed or believed in 1784 that when the owner died his property belonged to the state or its surviving members. The power to dispose of property by will was declared by the provincial statutes, which also provided for its disposition among the next of kin in case there was no will. Act May 14, 1718; 2 N. H. Laws (Batch.) 295.

"The Liberties of the Massachusetts Colonie in New England" of 1641 at a time when practically all of New Hampshire in existence was in union with Massachusetts contained the following declaration: "All our lands and heritages shall be free from all fines and licences upon Alienations, and from all hariotts, wardships, Liveries, Primer-seisins, yeare day and wast, Escheates, and forfeitures, upon the deaths of parents or Ancestors, be they naturall, casuall or Juditiall." 1 N. H. Laws (Batch.), *pp.* 748, 753.

Instead of understanding that upon death the property of the de-

cedent passed to the state, in the beginnings of New England it was solemnly declared that under no circumstances should the title to the decedent's property vest in the state. If in Massachusetts the power to take a part of a decedent's property is sufficiently established by constitutional authority "to impose and levy reasonable duties and excises" (*Minot* v. *Winthrop*, 162 Mass. 113), the New Hampshire constitution omitted that provision. *State* v. *Company*, 60 N. H. 219, 249. Undoubtedly the state had the power frequently exercised to regulate the transmission from the dead to the living but it had no power to confiscate the whole. Power to take a part cannot be here based upon a non-existent power to seize all.

The argument for the state attacks the decision in *Curry* v. *Spencer*, 61 N. H. 624, and if adopted in full would sustain the validity of an inheritance tax without reference to the constitutional amendment of 1903 upon which legislation of this character has been since supposed to rest. *Curry* v. *Spencer* was decided in 1882 and has ever since been accepted as correctly construing the fundamental law. The constitution has been once amended because of the decision and on three other occasions propositions for constitutional change because of the construction therein announced have been submitted to the people who have decided each time against a change. It is undoubtedly, viewed with reference to decisions in other jurisdictions, "an extreme case," as it is characterized in *Magoun* v. *Company*, 170 U. S. 283, 292. It rests upon the breadth of view with which the constitutional rule of equal rights and of uniformity in taxation has been here expounded and applied for one hundred and forty years.

We are not disposed to disturb the conclusions recognized here at least as legally sound for forty years in order to sustain the act in question. The discussion must begin with the proposition that except for the amendment to the constitution adopted in 1903 both the act of 1919 and that of 1905 would be without constitutional support. The act of 1905 adopted under the amendment of 1903 was attacked in *Thompson* v. *Kidder*, 74 N. H. 89, upon the ground that although the act was within the terms of the power granted by the amendment, it conflicted with existing provisions of the bill of rights and the constitution which in *Curry* v. *Spencer* were held to avoid the act of 1878, c. 74. The legislation was then sustained upon the ground that the general intent of the constitution must give way to the particular intent expressed in the amendment. This decision was announced in 1906 and does not appear to have been questioned up to this time. The reasoning then adopted as the basis of the de-

cision seems conclusive of the present controversy. It was conceded
that the act necessarily violated the constitutional provisions relied
upon, but it was held that the people having authorized legislation
of this character must have intended to modify existing provisions
avoiding such legislation so far as necessary to permit it. The act
was then examined as to the extent to which it conflicted with other
constitutional provisions. It was considered that any inheritance
tax was not a proportional division of public expense and hence was
to this extent in conflict with the constitutional provisions relied
upon, but as this conflict was essential and inherent in such a tax, it
was held the conflict did not avoid the legislation.

It was then said, "but although the power to impose an inheritance
tax is clear, it must be exercised so far as possible in accordance with
all other provisions of the constitution. It must be an equal tax in
the sense that it must affect all persons equally. In the present law
all property taxed is taxed at the same rate, and the difficulty found
in some cases with exemptions of a certain amount of property and
with a tax varying according to the amount of property does not
appear." This difficulty is now presented. The state claims that
the language used in submitting the amendment of 1903 to the peo-
ple, "Do you approve of empowering the legislature to impose
taxes not only upon polls and estates but also upon other classes
of property including franchises and property when passing by
will or inheritance," had prior to 1903 acquired a peculiar mean-
ing in the law as implying an inheritance tax. P. S., *c.* 2, *s.* 2,
"words and phrases shall be construed according to the common
and approved usage of the language; but technical words and
phrases, and such others as may have acquired a peculiar and
appropriate meaning in law, shall be construed and understood ac-
cording to such peculiar and appropriate meaning," is relied upon.
The chapter cited was first enacted as chapter 1 of the General
Statutes in 1867 and was intended as a guide for the construction of
the following statute law. It has no more weight in the construction
of constitutional language than in the interpretation of a will. *Morse
v. Osborne,* 75 N. H. 487, 488. But though the reason is not applicable,
the conclusion is sound. The words have been understood to grant
authority to enact an inheritance tax ever since their insertion in the
constitution. The situation here is unique. The industry of counsel
for the state has provided us with information as to the constitutions
and laws of all the states. Attention has not been called to any con-
stitution expressly granting power to lay taxes of this nature. We

are not concerned with the question whether inheritance taxes may be laid. The constitution in terms permits. It is therefore unnecessary, as said in *Thompson* v. *Kidder*, to determine the definition of the tax. It is immaterial on the constitutional question whether the tax is properly described as an excise, commodity, succession, privilege or property tax. The question here is whether the particular tax contains provisions not inherently essential to an inheritance tax which are in conflict with provisions of the constitution not expressly abrogated.

In 1923 the justices of the court were constitutionally interrogated by the legislature as to the validity of a proposed law imposing a graduated inheritance tax upon collateral inheritances. See *Opinion of the Justices, post.*

Upon a review of the discussions in the convention of 1903 and consideration of the question submitted to the people, the justices were of the opinion that the people must have had in mind in voting for the amendment the rules of property taxation familiar by frequent exposition, *i. e.* that all taxation under the power granted should be at a uniform rate. It was not said that the tax was a property tax, but the possible incorrectness of the view that it was, then thought to have been held by the convention and the people, was suggested. Attention was called to the fact that proposals expressly providing for classified, graduated and progressive rates were rejected and the final proposition adopted described a property tax if the language used were given its ordinary signification. Journ. Conv. 1903, *pp.* 249, 250, 594, 595, 601, 625, 626, 628; House Journal, 1923, *pp.* 426, 429. It is now argued that the particular propositions permitting graduated rates were rejected because it was thought the general terms adopted included the authority desired to be granted. It perhaps can fairly be said that the purpose of the convention was to adopt language which would sustain an inheritance tax whether it should be considered a tax on property or upon privilege. Journal Conv. 1903, *pp.* 595, 596. It may also be argued that it was thought that the adoption of language expressly providing for absence of uniformity, a proposition entirely contrary to fundamental principles as here understood, would result in the defeat of the amendment, — a view, if entertained, entirely justified by the fact that the power when so expressed did not meet the approval of the people when submitted to them in 1912, 1920, and 1921. Legislative Manual, 1913, *pp.* 280, 310, 312; 1921, *p.* 324; 1923, *pp.* 55, 58. On the last submission in March, 1921, the proposition not only failed to receive the

constitutional majority of two-thirds necessary for its adoption but there was an actual majority against it. Whatever may be the correct deduction to be drawn from the debates in the convention the material question is what interpretation can fairly be put upon the action of the people. *Harvard College* v. *State*, 106 Ohio, 303, 306. They were asked to consider a question of taxation. They were not called upon to consider the removal of all inheritable quality from their conception of property subject to the arbitrary whim of the legislature. They were not asked to vote for or against excise, commodity, succession or privilege taxes, but were in plain terms invited to consider a tax upon property. The question submitted at the polls was, "Do you approve of empowering the legislature to impose taxes not only upon polls and estates but also upon other classes of property, including franchises and property when passing by will or inheritance;—as proposed in the amendment to the constitution?" And they were advised that if the proposal received their approbation the constitution when amended would read as follows: "The public charges of government or any part thereof may be raised by taxation upon polls, estates, and other classes of property, including franchises and property when passing by will or inheritance." Const., Part II, *art.* 6; Journ. Conv. 1903, *pp.* 861, 890, 891. The statute we are considering declares certain property shall be subject to a tax. The language of the constitution and the statute in form imposes a tax upon property. *Minot* v. *Winthrop*, 162 Mass. 113, 122. While in applying the tax or considering its constitutionality under provisions permitting certain classes of taxes, its actual character may be of great importance, in construing the vote of the people, the language then used is controlling.

It seems clear that the people must have understood that they were called to vote upon a question of taxation so related at least to property taxation as to lead to the understanding, no special exception being made, that the rules with which they were familiar in taxation of that character were to be applied so far as possible.

"Under our constitution, the power to tax is a power not to destroy the right of property by a discriminating process of classification or selection, but to equitably defray the expense of protecting the right of property and other rights." *State* v. *Company*, 60 N. H. 219, 253.

"Since 1833, the legislative and judicial construction of the constitution has been that an equal division requires a proportional

valuation of all property . . . and the assessment of all at the same rate." *Opinion of the Justices,* 76 N. H. 588, 591. In *Amoskeag Mfg. Co.* v. *Manchester,* 70 N. H. 200, it was said (*p.* 204), "The general principles of uniformity and equality essential to legal taxation under our constitution and laws have been so fully and frequently elaborated 'during the last fifty-three years' that any discussion at the present time of principles no longer 'a subject of debate or doubt' would serve no useful purpose." This was in December, 1899. When the case was again before the court six months later, the thought was repeated. It was said: "By an unbroken line of decisions in this state during the last seventy-three years, from the *Opinion of the Justices* in 1827 (4 N. H. 565) to the decision in this case at the last term, . . . it has been conclusively settled that the constitutional rule of equality in taxation requires that throughout the same taxing district the same tax shall be laid upon the same amount of property." *Amoskeag Mfg. Co.* v. *Manchester,* 70 N. H. 336, 344.

"By New Hampshire law, taxation is not extortion practised upon the people by an oppressor. . . . It is a division among themselves of the expense of their own government of themselves, — a division made by themselves through their own agents, in pursuance of their original contract." *Edes* v. *Boardman,* 58 N. H. 580, 589.

The cases in which these questions were considered and decisions announced were mainly controversies between taxpayers and the towns in which they were taxed; cases in which the citizens generally were interested, and it is confidently asserted that taxation as understood here when the constitution was amended meant equal treatment to every one and meant, when property was the basis or measure of the tax, a uniform rate, and it was also understood that equality and uniformity were essential characteristics of every process which could be included under the term taxation.

The conclusion seems irresistible that in 1903 it was understood additional power of taxation was being granted and, no special exception of existing constitutional provisions being made, only such provisions can be disregarded as are necessarily in conflict with the power granted. This was the conclusion in *Thompson* v. *Kidder,* and to the views then expressed the court still adheres. An inheritance tax can be laid at a uniform rate upon all subjects, whether property or rights.

In *Thompson* v. *Kidder* the act was also attacked upon the ground that the tax was limited to property passing to collaterals, that

all property was not taxed. The objection was disposed of upon the ground that under the practical construction given the constitution only such property was taxable as was made so by the legislature. That the legislature had power by special provision, or by omitting certain property from the taxable list, to make reasonable exemptions of property from taxation. In other words, that the legislature had power to classify property into taxable and non-taxable. *Canaan* v. *District*, 74 N. H. 517, 538–541.

Authority for no other classification exists under New Hampshire law. The only classification permitted in New Hampshire taxation is into taxable and non-taxable. That is the only one that can be made. In 1911 the justices, in answer to the house of representatives, upon the supposed authority of *Thompson* v. *Kidder*, expressed the opinion that an assessment might be made, at rates varying in accordance with relationship to the testator or ancestor. In the same opinion the justices cautioned the house that their opinion was in no sense an adjudication of the question. *Opinion of the Justices*, 76 N. H. 597, 599. And in 1852 in an opinion given the house of representatives upon the question of the constitutionality of a proposed bill the justices said, "we feel it due to ourselves . . . to say that whatever opinions we might express upon this bill, must be regarded as impressions by which we should not feel ourselves bound, if the bill should become a law, and if the rights of a citizen should depend on its construction." *Opinion of the Justices*, 25 N. H. 537, 538.

Upon the argument it has been claimed that *Thompson* v. *Kidder* does not sustain the position taken by the justices on this point. Upon examination of the case the majority of the court are satisfied that the point is well taken. The only classification sustained in that case is between taxable and non-taxable. Any other classification for taxation of property or rights is contrary to the equality of right in the constitution as it has been interpreted since 1784. In *Thompson* v. *Kidder* the taxation of polls was referred to as a class of taxation permitted although not a proportional division of public expense, but it has never been understood that polls could be classified so as to be taxed at different rates. All taxed are taxed at the same rate. See *Opinion of the Justices*, 4 N. H. 565, 570. The unconstitutionality of *s*. 1, *c*. 37, Laws 1919, is settled by the decision in *Thompson* v. *Kidder*. That such has been the general consensus of opinion is shown by the several ineffective attempts to obtain constitutional amendments to permit just what this section

attempts. The conclusion reached depends upon the New Hampshire view of equality in taxation which is more nearly expressed in Judge *Brewer's* dissenting opinion in *Magoun* v. *Company*, 170 U. S. 283, 301, than in that of the majority. This case of course conclusively establishes that the act does not contravene federal law, but it is not decisive here. It is also true that following this case most jurisdictions with constitutional provisions more or less similar to ours have upheld similar legislation, but these considerations though of weight are not controlling. The question is one of New Hampshire law. Just before his death in 1896, Chief Justice *Doe* prepared an elaborate opinion in a then pending case. The opinion was printed and distributed among his associates. In the decision of the case a year later, it was thought the principles set forth were not applicable to the particular case. The opinion has, however, often been cited and quoted from as an authoritative statement of the New Hampshire rule of equality, following the opinion of the same judge announced as the judgment of the court in a matter of taxation. *State* v. *Company*, 60 N. H. 219, 246. The following is quoted from this opinion and adopted as a correct statement of New Hampshire law: "Without uniformity there is no equality. . . . Uniformity and equality of rights are necessary for the safety of every citizen. . . . Without equality nothing is secure. The settled constitutional right of equal privileges and equal protection under general law rests on incontestable grounds of wisdom and necessity. The equal protection of the laws recently inserted in the federal constitution has been a New Hampshire doctrine 110 years; and it has been maintained here in a breadth of meaning and a scope of practical operation unknown elsewhere. . . .

. . . One of two classes of physicians, differing only in respect to residence, cannot be subjected to the expense of obtaining a license from which the other is exempt. *State* v. *Pennoyer*, 65 N. H. 113. Two recent decisions, holding the contrary, are cited in Cooley, Const. Lim., 484, *n.* In *State* v. *Pennoyer* (*p.* 114) are cited seventeen New Hampshire decisions on the subject of equal rights in the matter of taxation, — a subject on which the uniformity and equality required by the established construction of our constitution is in striking contrast with the inequality and injustice that prevail elsewhere. An examination of the authorities shows an unconstitutionality of unequal rights in this State, and their constitutionality in other jurisdictions, state and national, to such an extent that on a question of this kind the authorities that maintain in-

equality elsewhere are entitled to no weight here. It is one of the subjects on which the policy of the state is too firmly established to be changed by this branch of the government. Admit for the purpose of the argument all that may be said of the peculiarity of the New Hampshire doctrine of constitutional equality. And admit that it is wrong and opposed to the common welfare and that despotic power with boundless partiality and discrimination as practiced in various regions of the East is more conducive to the interest of the community, . . . All this, taken for granted, would not affect this case, the decision of which is determined by legal reasons as conclusive as those which require us to adhere to the construction that 'trial by jury' means trial by twelve men giving a unanimous vote, whatever may be the opinion of the court on the question whether trial by a smaller number deciding by major vote would be better. Constitutional construction fixed by the reported decisions of sixty-seven years is not to be dealt with like unimportant forms of procedure, or English rules of law that are not adapted to the situation and circumstances of this country. On questions concerning the foundations of society where a system of government has lasted more than a century, the ancient landmarks cannot be removed by judicial decisions."

It has been suggested that as the legislature had power to impose a tax at a single rate, the act could be sustained if construed to impose a tax at the rate of one per cent. upon all the various classes. That would be so, if a legislative intention to impose such a tax could be found from the language used. A tax at five per cent., the highest rate, would be equally within the legislative power. But the court cannot choose for the lawmakers; to select one of the rates and apply it to all the classes would be an act of legislation not of construction. The legislature intended to substitute a new system as a whole, and as all the provisions cannot be carried into effect and as it is impossible to tell what part the legislature would have adopted independently, the whole section is void. *Opinion of the Justices,* 76 N. H. 601, 605; Cool., Con. Lim. (6th *ed.*), 209–212; *Copp* v. *Henniker,* 55 N. H. 179, 203; *East Kingston* v. *Towle,* 48 N. H. 57, 65, 67; *State* v. *Gerry,* 68 N. H. 495, 503.

As the whole section is void, the question arises what effect, if any, the adoption of the void section had upon existing law, *s.* 1, *c.* 106, Laws 1915. It is universally held that a valid act is not affected by the enactment of a void amendment, even if there are words of express repeal, unless it is clear the legislature intended

such repeal. *Sullivan* v. *Adams*, 3 Gray 476; *Childs* v. *Shower*, 18 Iowa 261, 272; *Tims* v. *State*, 26 Ala. 165, 170; *State* v. *LaCrosse County Judge*, 11 Wis. 50, 56; *Wilkison* v. *Board*, 158 Ind. 1; *People* v. *Butler St. Foundry*, 201 Ill. 236, 257, 258; *State* v. *Peelle*, 121 Ind. 495, 509, 510. The rule of the only case of opposite holding, *Meshmeirer* v. *State*, 11 Ind. 482, is not followed in Indiana or elsewhere. Bishop, Written Laws, *p.* 34; Cooley, Const. Lim., \*186. "Where a repeal of a prior law is inserted in an Act in order to secure the unobstructed operation of such act, and the repealing law is itself held to be void, the provisions for the repeal of the prior law will fall with it." *State* v. *Rice*, 115 Md. 317; *State* v. *Benzinger*, 83 Md. 481. The question, however, is merely one of legislative intention. "'There is probably no jurisdiction in which a legislative purpose is carried into effect by a more liberal mode of construction than that which prevails in this state. But the most liberal construction is nothing more than the ascertainment of that purpose from competent evidence.' *Boston etc. R. R.* v. *Railroads*, 65 N. H. 393, 399." *State* v. *Railroad*, 76 N. H. 146, 149,

The legislature had power of course to repeal the existing law, if that was their intention, irrespective of the validity of the new provisions. The method adopted of striking out the existing section and inserting a new one with added matter does not leave the matter quite so clear as it would have been if the added matter had been independently enacted, but the fact that the former section was at once reënacted is weighty evidence that the legislative purpose was not to abandon the collateral tax which had been in force since 1905. The general purpose was to retain that and to add another. The validity of a progressive tax was subject to discussion in the state. In 1911, the house of representatives were told the justices were in doubt as to the constitutionality of such a law. The constitutional convention of 1912 submitted an amendment expressly authorizing taxation as provided in the act of 1919. This amendment was not adopted by the people. Conv. Journ. 1912, *pp.* 563, 612. Leg. Manual, 1913, *pp.* 280, 310, 312. There must therefore have been doubt in 1919 as to whether the amendments proposed to the statute would be of any effect and it is not probable that the legislature intended if these amendments did not take effect to destroy the law as it existed in 1919. Chapter 106, Laws 1915.

II. The federal estate tax is an excise upon the estate at the death of the owner. It is not a tax upon succession and receipt of benefits under the law or the will. "What this law taxes is not

the interest to which the legatees and devisees succeeded on death, but the interest which ceased by reason of the death. *Knowlton* v. *Moore,* 178 U. S. 41, 48, 49." *Young Men's Christian Ass'n* v. *Davis,* 44 Sup. Ct. Rep. 291, 292; *Edwards* v. *Slocum,* 44 Sup. Ct. Rep. 293.

The state tax is imposed upon or measured by the amount passing to each legatee or heir. Laws 1915, *c.* 106, *s.* 1. If by virtue of federal legislation or for any other reason a less amount passes under the laws of this state, a less tax is imposed. *Kingsbury* v. *Bazeley,* 75 N. H. 13.

Whether the federal tax comes out of the *residuum* or diminishes *pro rata* the particular legacies is matter of local law. *Edwards* v. *Slocum,* 287 Fed. Rep. 651; s. c., 44 Sup. Ct. Rep. 293.

If there is no will and the estate is divisible among several heirs, the share of each is necessarily depleted *pro rata* by the tax. If there is a will which so declares, as in the *Klous* case, the tax comes out of the *residuum.* If the will is silent upon the subject, it can be inferred the testator in this respect wished his property distributed as if no will had been made.

Accordingly, in the absence of testamentary provision, it was held in *Fuller* v. *Gale,* 78 N. H. 544, that the tax should not all be imposed upon the residuary legatee, but should be prorated among the recipients of the testator's bounty. See *Hampton* v. *Hampton* (Ky.), 10 A. L. R. 515. A different result has been reached elsewhere. See *Plunkett* v. *Company,* 233 Mass. 471. In a will made after the decision in *Fuller* v. *Gale,* and with actual or presumed knowledge of its terms, failure to provide for the payment of these taxes from the estate would be convincing evidence that it was not intended that they should fall entirely upon the residuary legatee. In the absence of evidence from which a contrary intention can be found the rule of *Fuller* v. *Gale, supra,* should be followed.

III.   (a) The tax upon stocks of foreign corporations and deposits in banking institutions outside the state.

The tax is imposed with reference to property within the jurisdiction of this state which passes by virtue of the laws of this state. If the title passes through the executors or the property in the course of administration comes within this jurisdiction, the statute applies. *Mann* v. *Carter,* 74 N. H. 345.

(b) Liberty bonds.

It is conceded that liberty bonds are in the statute authorizing them expressly made subject to state inheritance taxes, but it is

claimed that congress is without power to authorize a state to impose a property tax upon obligations of the United States. The argument under this and the preceding question appears to rest upon an understanding that the court has held or was about to hold that the inheritance tax in this state was purely a property tax. But the court has not so held.

The only case in which the court has found it necessary to define the nature of the tax is *Carter* v. *Craig*, 77 N. H. 200, where it is said (*p.* 205): "The purpose the legislature had in view when it enacted section 1, chapter 68, Laws 1907, was to raise money to pay the expenses of the state by taxing the right to succeed to property passing by will or inheritance. It will not be necessary to consider the constitutionality of this purpose, for that is no longer an open question. *Thompson* v. *Kidder*, 74 N. H. 89." Though the tax is in form upon property and so related thereto that it is impossible to discuss it except as such a tax, it differs from an ordinary property tax in that its generating source is not directly the distribution of public expense but the death of the owner. In effect the tax is upon the right of succession, and is measured by the value of the property to which succession is had. It is so regarded in the federal law. *Magoun* v. *Company*, 170 U. S. 283. As a tax on the right or privilege to acquire property rather than upon the right to possess or keep it the validity of such a tax indirectly on obligations of the United States is sustained by the federal law. *Plummer* v. *Coler*, 178 U. S. 115. The logic of the distinction is not here material. The question is determined by another jurisdiction whose decision on the question is binding on this court. These bonds are to be considered in assessing the state tax.

It was suggested in argument that in the *Klous* case no federal tax was assessable against the estate. If this suggestion is correct, the appeal should be dismissed, as the taxes assessed were all assessable under the law as it existed prior to the act of 1919.

In the *Williams* case, the appeal should be sustained and a reassessment made according to the rules herein stated. As has been said, no question of procedure has been raised. The existence or extent of the remedy of one who has paid an over-assessment has not been considered.

The technical order in each case is        .        *Case discharged.*

PEASLEE and PLUMMER, JJ., concurred: YOUNG, J., concurred in the result in the *Klous* case, but dissented in the *Williams* case.

SNOW, J. Having read the briefs filed in these cases, including the oral argument for the state which was submitted in writing, I concur in the majority opinion that Laws 1919, c. 37, s. 1 is unconstitutional and that Laws 1915, c. 106, s. 1 stands unrepealed: Having been absent at the presentation of the oral arguments I refrain from expressing any opinion upon the remaining issues.