Merrimack
No. 97-001

## CLAREMONT SCHOOL DISTRICT & a.

### v.

## GOVERNOR & a.
*(statewide property tax phase-in)*

October 15, 1999

*Stein, Volinsky & Callaghan, P.A.*, of Concord (*Andru H. Volinsky* and *Scott F. Johnson* on the motions, and *Mr. Volinsky* orally), and *John E. Tobin, Jr.*, of Concord, on the motions and orally, for the plaintiffs.

*Philip T. McLaughlin*, attorney general (*Mr. McLaughlin & a.* on the motions, and *Martin P. Honigberg* orally), for the State.

*Michael L. Donovan*, of Concord, for the Town of Rye, on the pleadings, as *amicus curiae*.

*Loretta S. Platt* and *Betsy B. Miller*, of Concord, for Certain Members of the New Hampshire House of Representatives, on the pleadings, as *amici curiae*.

*Rath, Young and Pignatelli, P.A.*, of Concord (*William F. J. Ardinger* on the pleadings), for the Business and Industry Association, as *amicus curiae*.

*Elizabeth S. Hager*, State Representative, of Concord, on the pleadings, for herself and certain other State Representatives, as *amici curiae*.

*Flygare, Schwarz & Closson, PLLC*, of Exeter (*Thomas M. Closson* on the pleadings), for the City of Portsmouth, as *amicus curiae*.

*Wadleigh, Starr & Peters, P.L.L.C.*, of Manchester (*Eugene M. Van Loan III* on the pleadings), as *amicus curiae*.

*Frank V. Sapareto*, State Representative, of Derry, on the pleadings, as *amicus curiae*.

*Gene G. Chandler*, State Representative, of Bartlett, on the pleadings, as *amicus curiae*.

*Joseph S. Haas, Jr.*, of Ashland, on the pleadings, as *amicus curiae*.

*Kenneth E. Blevens, Sr.*, of Bow, on the pleadings, as *amicus curiae*.

BROCK, C.J. More than sixteen months after our decision in *Claremont School District. v. Governor*, 142 N.H. 462, 465, 703 A.2d 1353, 1354 (1997) (*Claremont II*), holding that the "system of financing elementary and secondary public education in New Hampshire is unconstitutional," the legislature passed an act in April 1999 "establishing a uniform education property tax . . . to provide funding for an adequate public education." Laws 1999, ch. 17 (Act). The plaintiffs challenge several components of the Act, including: (1) whether the phase-in of the statewide property tax is constitutional; (2) whether the State's use of the total equalized valuation instead of the equalized assessed valuation results in unequal tax rates; (3) whether the 9.75 percent discount from the per pupil cost of adequacy has any sufficient legal basis; (4) whether the State may constitutionally discount the cost of transportation included in the cost of adequacy; (5) whether the State may constitutionally exclude all funds for capital costs from its calculation of adequacy; and (6) whether the State acted in good faith when it delayed full implementation of its responsibility to provide and fund constitutional adequacy until September 2004. In addition, the plaintiffs request that the court assign to a master for purposes of fact-finding the questions: (1) what is the definition of a constitutionally adequate education; and (2) what is the cost of a constitutionally adequate education. Further, the plaintiffs seek compensatory educational services and sanctions.

We address only whether the phase-in of the statewide property tax is constitutional and hold that it is not. With the exception of the pending motion for attorney's fees, which we now have under advisement, the petitioners' remaining requests for relief are denied, without prejudice, as being premature. We state once more that "we were not appointed to establish educational policy, nor to determine the proper way to finance its implementation," *Claremont II*, 142 N.H. at 475, 703 A.2d at 1360, and that "[i]t is neither our task nor intent to manage the public school systems of the State," *Opinion of the Justices (School Financing)*, 142 N.H. 892, 903, 712 A.2d 1080, 1088 (1998). It is, however, the duty of the judiciary to protect constitutional rights and in doing so "to support the fundamentals on which the Constitution itself rests." *Trustees &c. Academy v. Exeter*, 90 N.H. 472, 487, 27 A.2d 569, 581 (1940).

The Act is a comprehensive piece of legislation that establishes an "education property tax and a utility property tax, increas[es] the business profit and real estate transfer taxes, and includ[es] other sources of revenue to provide funding for an adequate public education and mak[es] an appropriation therefor." Laws 1999, ch.

17. The education property tax portion establishes a statewide tax "at the uniform rate of $6.60 on each $1000 of the value of taxable property." Laws 1999, 17:14 (to be codified at RSA 76:3).

In each municipality in which the education property tax exceeds the amount necessary to fund an adequate education, the excess must be remitted to the department of revenue administration. Laws 1999, 17:41 (to be codified at RSA 198:46, I). During the tax years 1999-2004, however, the Act directs those municipalities to collect and remit to the department of revenue administration not more than the following percentages of the excess amounts: ten percent in tax year 1999; twenty percent in tax year 2000; thirty percent in tax year 2001; fifty percent in tax year 2002; seventy-five percent in tax year 2003; and 100 percent in tax year 2004. Laws 1999, 17:41 (to be codified at RSA 198:46, IV).

The practical effect of this phase-in is that in fifty "property rich" towns across the State, the full rate of $6.60 per thousand is imposed gradually over five years, while taxpayers in the remaining towns pay the full rate immediately. *See Claremont II*, 142 N.H. at 467, 703 A.2d at 1355 ("property poor" versus "property rich" town depends on total value of property subject to taxation in given district). For example, under the provisions of the Act, the tax rate per thousand in 1999 in Rye is approximately $3.79, in Moultonborough $3.18, and in Waterville Valley $1.43. In contrast, in Claremont, Allenstown, and other towns with lower property values the tax rate per thousand is $6.60. The State acknowledged at oral argument that facially the phase-in perpetuates a disproportionality for five years.

The State suggests, however, that the phase-in "can be viewed as a partial abatement of an overall tax liability, or as a partial exemption of a portion of the value of real property taxable in donor towns." The phase-in provision cannot constitute an abatement because it does not limit tax relief to "persons aggrieved" by the assessment of a tax. RSA 76:16, I (Supp. 1998). Therefore, we review the constitutionality of the phase-in provision as a tax exemption.

"The basic principle that all taxpayers shall share the public expense equally . . . is not violated by a legislative exemption of a certain class of property from taxation, in whole or in part, provided the exemption serves the general welfare." *Eltra Corp. v. Town of Hopkinton*, 119 N.H. 907, 912, 409 A.2d 1145, 1148 (1979). "If there is a just reason for the classification of taxable property, and the proposed selection is not arbitrarily made or for the sole purpose of preferring some taxpayers to others it will be upheld." *Opinion of*

*the Justices (Current Use Reimbursement Program)*, 137 N.H. 270, 275, 627 A.2d 92, 95 (1993) (citation and quotation omitted); *see Smith v. N.H. Dep't of Revenue Admin.*, 141 N.H. 681, 687, 692 A.2d 486, 491-92 (1997) (distinction between taxable and nontaxable property must be reasonable in the sense that it may be deemed to be just). For the phase-in to meet constitutional standards, the legislature must provide a just reason for the classification, the phase-in must serve the general welfare, and the selection made must not be arbitrary.

The reasons for the phase-in are set forth in the Act as follows:

> In cities and towns with relatively higher property values, sharp increases in property taxes may cause business failure where fixed costs increase faster than the ability to recoup them. Commercial rental property owners may find themselves locked in by lease provisions that prevent them from recouping tax increases from tenants, resulting in reduced reinvestment in the property, and potential foreclosure or bankruptcy. Also, substantial increases in property tax obligations may cause or permit lenders to foreclose on mortgage notes based on the decreased ability of the borrower to meet the income level required by the lender. Tax capitalization which decreases property values may also cause foreclosures on otherwise performing loans because the regulated lending institution must call the loan to comply with rules and regulations. Therefore a phase-in provision is included herein which is intended to ameliorate these consequences as far as is practicable, and to allow property owners and local governments time to adjust to the new state education property tax enacted herein.

Laws 1999, 17:1, VI. In sum, the just reasons offered in support of the phase-in are to ameliorate the possibility of foreclosures, bankruptcies, or similar adverse economic consequences that could occur in cities and towns with relatively higher property values due to sharp increases in property taxes.

"[T]he wisdom and reasonableness of legislative measures are for the legislature to determine," *Opinion of the Justices*, 115 N.H. 228, 232, 338 A.2d 553, 556 (1975), and thus we defer to the legislature's reasons set forth in the Act. Legislative declarations, however, "have no magical quality to make valid that which is invalid." *Opinion of the Justices*, 99 N.H. 528, 530, 114 A.2d 514, 516 (1955) (quotation omitted). "It is the essential characteristics of the bill

which must determine its validity, rather than its declared purpose."
*Id.*

Reduced to its essence, the phase-in provision establishes two distinct classes of taxpayers, those required to pay the full rate of $6.60 per thousand and those required to pay some lesser rate on like property for a five-year period. "Justices of this court have consistently interpreted the New Hampshire Constitution as requiring that all property within a given class be taxed at a uniform rate." *Opinion of the Justices,* 123 N.H. 296, 301, 460 A.2d 93, 97 (1983) (emphasis omitted); *see Opinion of the Justices,* 131 N.H. 640, 642, 557 A.2d 273, 275 (1989) (legislature may not create systems of taxation which would result in two classes of taxpayers paying differing rates of tax on essentially the same class of property). "All taxes on like property and for like purposes must be equal." *Opinion of the Justices,* 99 N.H. 525, 527, 113 A.2d 547, 548 (1955) (quotation omitted). "[T]o the extent that a property tax is used to raise revenue to satisfy the State's obligation to provide an adequate education, it must be proportional across the State." *Opinion of the Justices (School Financing),* 142 N.H. at 901, 712 A.2d at 1086.

Over the years, the legislature has enacted numerous exemptions that allow tax relief to taxpayers who meet identified criteria. *See, e.g.,* RSA 72:23 (Supp. 1998) (real estate and personal property tax exemption for *inter alia,* churches, schools, and charitable organizations); RSA 72:36-a (Supp. 1998) (tax exemption for certain disabled veterans who own a specially adapted homestead); RSA 72:37 (Supp. 1998) (tax exemption from the assessed value on a residence to the value of $15,000 for every inhabitant who is legally blind). The court has, however, struck down legislation when the means employed to effect a tax exemption failed to comport with the articulated justification. *See, e.g., Felder v. Portsmouth,* 114 N.H. 573, 578-79, 324 A.2d 708, 711 (1974) (although homeowners' exemption law is directed toward a legitimate public purpose, it is unconstitutional because the minimum valuation provision discriminates against the poor by unreasonably raising their taxes to finance tax relief for persons owning more expensive homes); *Opinion of the Justices,* 113 N.H. 87, 89, 302 A.2d 112, 114 (1973) (while "[p]ublic assistance, afforded in a limited way and without discrimination, to persons eligible therefor by reason of lack of means of their own, is a recognized exercise of the protective power," a return of State funds to homeowners only and not all property taxpayers "would not be a public purpose").

This court owes great deference to the legislature's justification for the phase-in of a uniform tax rate in the so-called "property rich" communities. It is not our role nor indeed within our authority to second-guess the rationale for tax exemptions articulated by the legislature or to substitute our judgment for theirs. Rather, our role is to determine whether, on its face, the justification for disparate tax treatment is rational and supported by appropriate findings and whether the relief granted is reasonably related to the underlying purpose of the proposed exemption. Here, the legislature determined that some taxpayers in the "property rich" communities are likely subject to serious adverse economic consequences by the immediate implementation of a $6.60 per thousand tax rate. In its wisdom and with the benefit of economic forecasts, the legislature concluded that the economic burden on the at-risk taxpayers should be phased-in. We cannot say that such concern lacks a rational basis or that just reasons would not exist to lighten the obvious economic burden.

Although we do not quarrel with the legislature's articulated goal of tax relief to the at-risk taxpayer, it is neither reasonable nor fair to award automatic tax exemptions to a majority of taxpayers in affected "property rich" communities who do not need them in order to assist those who would surely qualify. The classification created by the phase-in encompasses taxpayers who do not merit special tax treatment in accordance with the just reasons offered by the legislature. Indeed, at oral argument the State acknowledged that the vast majority of taxpayers in the municipalities that will benefit from the phase-in will not face the harms that the phase-in is intended to prevent. The phase-in provision as written contains "no criteria by which to limit its assistance," *Felder*, 114 N.H. at 577, 324 A.2d at 710, and the State offers no reason for creating blanket exceptions for all taxpayers within cities or towns in which some property owners may face the risk of bankruptcy or foreclosure due to sharp increases in property taxes.

By awarding tax relief to the many who are not in jeopardy of economic hardship from a $6.60 per thousand tax rate to assist those who are, the legislature has cast too wide a net at the problem it intended to solve. Consequently, because its remedy far exceeds the underlying rationale for the phase-in and assists a large class of taxpayers to whom disparate tax treatment cannot be justified, the selection of taxpayers is "so arbitrary as to serve no useful purpose of a public nature," *id.* (quotation omitted), thereby failing to serve the general welfare. Thus, the phase-in provision must fail, as it

violates Part II, Article 5 of the State Constitution in that the varying property tax rates are unreasonable and disproportionate. *See Claremont II*, 142 N.H. at 471, 703 A.2d at 1357.

Moreover, we give heed to the words of Chief Justice Doe written more than one hundred years ago: "A state law selecting a person or class or municipal collection of persons for favors and privileges withheld from others in the same situation . . . is at war with a principle which this court is not authorized to surrender." *State v. Griffin*, 86 N.H. 609, 614, 186 A. 923, 926 (1894) (Doe, C.J., *see* Reporter's Note). That principle he described as "[u]niformity and equality of rights." *Id.* In the field of taxation, the principle of uniformity and equality of rights is of paramount importance and has been embodied in the "proportional and reasonable" language of Part II, Article 5 of our State Constitution since June 2, 1784. *See Claremont II*, 142 N.H. at 468, 703 A.2d at 1355.

In this case, the classification at issue imposes a State tax on property at different rates for five years based solely on the location of the property. We can find no case where different rates of taxation exist in a State tax from one municipality to another. We can conceive of none that would pass muster under the words of Chief Justice Doe or the provisions of Part II, Article 5. A phase-in of a State tax providing for gradually increasing rates statewide is not unconstitutional; however, one where the rates vary from one municipality to another is. We should never lose sight of the fact that our language on taxes requiring uniformity and equality is not something invented in the *Claremont* cases, but is the far-reaching language of constitutional mandate which has guided every tax decision of this court for over two hundred years.

Having concluded that the phase-in provision is unconstitutional, we must determine whether it is severable from the education property tax. The State argues that, "[i]n the event the Court determines that the phase-in of the statewide property tax is unconstitutional, the relevant provision is severable and should be severed, leaving the remainder of the statute intact." "In determining whether the valid provisions of a statute are severable from the invalid ones, we are to presume that the legislature intended that the invalid part shall not produce entire invalidity if the valid part may be reasonably saved." *Carson v. Maurer*, 120 N.H. 925, 945, 424 A.2d 825, 839 (1980) (quotation omitted). "We must also determine, however, whether the unconstitutional provisions of the statute are so integral and essential in the general structure of the act that they may not be rejected without the result of an entire collapse and destruction of the structure." *Id.* (quotation omitted).

We are unable to determine that the phase-in is severable from the education property tax provision as a whole. The record before us, including the legislature's express findings, underscores that the phase-in was "central to the legislature's purpose" in enacting the statewide property tax. *Antoniou v. Kenick*, 124 N.H. 606, 609, 474 A.2d 566, 567 (1984). We simply cannot say whether "the legislature would have enacted the [statewide property tax] without the offending provision." *Coffey v. Bresnahan*, 127 N.H. 687, 691, 506 A.2d 310, 313 (1986) (quotation omitted); *see Opinion of the Justices*, 108 N.H. 268, 275, 233 A.2d 832, 836 (1967).

■ ■ In addition, severing the phase-in provision from the remainder of the property tax would have the practical effect of immediately imposing a tax rate of $6.60 per thousand on all taxpayers of the State. "But the court cannot choose for the lawmakers; to select one of the rates and apply it to all the classes would be an act of legislation not of construction." *Williams v. State*, 81 N.H. 341, 353, 125 A. 661, 667 (1924), *overruled in part on other grounds by Amoskeag &c. Co. v. Dartmouth College*, 89 N.H. 471, 200 A. 786 (1938). While there is a presumption in favor of severability, the principle is not to be applied if it gives a statute meaning the legislature did not intend, either by addition or subtraction from its terms. *Woolf v. Fuller*, 87 N.H. 64, 69, 174 A. 193, 196 (1934). Because the phase-in is not severable from the education property tax but, rather, is integral and essential to it, we hold that the statewide property tax provision cannot stand.

■ We agree with the State, however, that our determination that the phase-in is unconstitutional does not require invalidation of the entire piece of legislation. We are unable to conclude on the record before us that the legislature intended that the invalidity of one part of the Act would produce entire invalidity. In fact, discussion on the floor of the House of Representatives during debate on the Act supports this conclusion:

Rep. LaPorte: Thank you Mr. Speaker. What about severability in this bill? If the Court tears down one part, what would happen to the rest of the bill? Will it stand on its own?

Rep. Bradley: Thank you for that question. There is no severability language in this bill, which I am told by legal scholars means that the concept of severability is implicit in the bill and if the

Court strikes down one provision, the remainder — remaining provisions will stand.

House of Representatives, Floor Debate on HB 117 Conference Committee Report, April 29, 1999. Because both parties agree that if the property tax portion of the Act, including the phase-in, is struck down as unconstitutional, the remaining provisions of the Act are severable, and because the legislative history supports this agreement, we concur.

It has been suggested that because the phase-in provision is temporary, it fundamentally differs from the special abatement that this court concluded would be unconstitutional in *Opinion of the Justices (School Financing)*, 142 N.H. at 902, 712 A.2d at 1087. We reject such a distinction. As all citizens are aware, there is nothing permanent about any piece of legislation; its terms and conditions are subject to change at the will of the political process. The constitution, on the other hand, contains core principles that remain constant over time upon which our State is founded. At their heart is the principle that "taxes be no less than fair, proportional, and reasonable." *Id.* at 903, 712 A.2d at 1087. For this court to sanction an unconstitutional system of taxation would require us to ignore longstanding constitutional principles.

*So ordered.*

THAYER, J., did not sit; BATCHELDER, J., retired, sat by special assignment under RSA 490:3; HORTON, J., dissented; the others concurred.

HORTON, J., dissenting: The majority holds the "phase-in" portion of Laws 1999, ch. 17 (Act) unconstitutional and invalidates the statewide property tax portion thereof. Since I am convinced that we must give deference to the legislature on this issue, I would hold that the Act is constitutional as against the "phase-in" challenge.

Most of the majority's analysis is correct. The legislature has recognized the unconstitutionality of the past method of funding education in this State as held in *Claremont School District v. Governor*, 142 N.H. 462, 703 A.2d 1353 (1997) *(Claremont II)*. It has followed the expectation expressed in *Claremont II* to "act expeditiously to fulfill the State's duty to provide for a constitutionally adequate public education and to guarantee adequate funding in a manner that does not violate the State Constitution." *Id.* at 477, 703 A.2d at 1360-61. In doing so, the legislature exercised the invitation in *Claremont II* to use a "wide latitude" of discretion in choosing the means of raising and disposing of public funds to satisfy the

constitutional mandate, a particularly legislative function. *Id.* at 476, 703 A.2d at 1360.

The legislature chose a method that includes disproportionality for a discrete period of time. As the majority correctly states, disproportionality in taxation is unconstitutional and, for this temporary "phase-in" to survive constitutional scrutiny, it must be based on a just reason, serve the general welfare, and not be arbitrary. Based on this standard, the majority holds that the "phase-in" fails constitutional scrutiny, as it finds the "phase-in" does not bear a rational nexus to the purposes stated by the legislature, that the "phase-in" remedy is too broad, and that the "phase-in" provision is too arbitrary to serve the general welfare.

I agree with the majority that the legislature's remedy involves disproportionality in taxation on a temporary basis and therefore involves a period during which the taxes assessed would be facially unconstitutional. Clearly, if the legislature had proposed a permanent tax discount or extended the "phase-in" over an unreasonable period, the provision should be stricken. *See Opinion of the Justices (School Financing)*, 142 N.H. 892, 712 A.2d 1080 (1998); *Green v. County School Board*, 391 U.S. 430, 438 (1968). However, we have no disproportionality consideration in this case, as structured by the majority, other than the "phase-in." Thus, for the purpose of this case, the remedy enacted by the legislature must be presumed constitutional at the end of the "phase-in" period, since the disproportionality factor terminates at the end of the "phase-in" period. I am intrigued by the issue of whether a facial constitutional flaw may be eliminated over time in a remedy structured to achieve a constitutional end.

It would appear that some corrections over time are permissible. The fact that an unconstitutional situation exists does not mean that all activities thereunder must cease. *Brown v. Board of Education*, 349 U.S. 294, 300 (1955). In *Brown*, all the segregated schools were not immediately closed. In our own case, *Claremont II*, we delayed invalidating the tax system found constitutionally flawed through the end of the 1998 tax year. *Claremont II*, 142 N.H. at 476, 703 A.2d at 1360. Common sense and practicalities must govern the remedy for constitutional implementation. That does not mean that the remedy can defer such implementation forever or delay such implementation absent a reason for delay, but it leaves room for judicial review of the remedy. The standard appropriate to this review is found in *Brown*:

> In fashioning and effectuating the decrees, the courts will be guided by equitable principles. Traditionally, equity has

been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs.

. . . .

While giving weight to these public and private considerations, the courts will require that the defendants make a prompt and reasonable start toward full compliance . . . . Once such a start has been made, the courts may find that additional time is necessary to carry out the ruling in an effective manner. The burden rests upon the defendants to establish that such time is necessary in the public interest and is consistent with good faith compliance at the earliest practicable date.

*Brown*, 349 U.S. at 300. *Milliken v. Bradley*, 433 U.S. 267 (1977), added another valid standard:

[T]he federal courts in devising a remedy must take into account the interests of state and local authorities in managing their own affairs, consistent with the Constitution.

*Id.* at 280-81. Thus, I would look to an equitable review of the proposed "phase-in." *See Serrano v. Priest*, 487 P.2d 1241, 1266 (Cal. 1971) (orderly transition from an unconstitutional to a constitutional system of school financing); *Horton v. Meskill*, 486 A.2d 1099, 1111 (Conn. 1985) (equitable principles taking into account the possibility of embarrassment to the operations of government); *Tenn. Small School Systems v. McWherter*, 894 S.W.2d 734, 738-39 (Tenn. 1995) (an equal protection case, approving phase-in over five years); *cf. McDuffy v. Sec'y of Exec. Off. of Educ.*, 615 N.E.2d 516, 556 (Mass. 1993) (declining to hold local property tax for funding education unconstitutional, but requiring appropriate legislative action within reasonable time).

Guided by these principles, I would hold that the "phase-in" of the State property tax in the donor towns is a proper part of the remedy and permissible if it meets the standards set forth above. I read these standards as requiring that:

1. The legislature make a prompt and reasonable start;
2. The State show that a time delay is necessary for the public interest;
3. The proposed remedy be consistent with good faith compliance at the earliest practicable date; and

4. The proposed remedy be consistent with the interest of the State to manage its own affairs consistent with the constitution.

## I. *Prompt and Reasonable Start*

Although there has been some wringing of hands about the time involved in the legislative process and, arguably, the legislature missed its court imposed deadline for fashioning a remedy, it is obvious that an enormous amount of effort has been expended on resolving this constitutional crisis. It is hard enough to reach a resolution among the five justices on this court. I can only imagine what it must be like for a massive legislature and a Governor with different ideas to reach agreement. I would hold that the legislature made a prompt and reasonable start and has proceeded in good faith and remarkable patience to fashion the remedy before us.

## II. *Time Delay Necessary in the Public Interest*

The legislature provided a statement of reasons for the "phase-in" and in its opinion the "phase-in" was necessary. Absent a finding that the legislature's statement of reasons is pretextual or made in bad faith, I would accept it at face value and defer to the legislature's opinion of necessity.

> This court has often stated that it is not the function of the judicial branch of the government to pass on the wisdom, desirability and expediency of statutes enacted by the Legislature. . . . It has also been the practice of this court to presume that a legislative act is constitutional and not to declare it invalid except on unescapable grounds.

*Niemiec v. King*, 109 N.H. 586, 587, 258 A.2d 356, 358 (1969) (quotations and citations omitted). "[C]ourts will never declare a statute void unless the nullity and invalidity of the act are placed, in their judgment, beyond all reasonable doubt." *Petition of Boston & Maine Corp.*, 109 N.H. 324, 325, 251 A.2d 332, 335 (1969) (citations omitted). The majority appears to accept the statement of reasons but substitutes its own opinion of necessity and its own remedial policy.

The legislature found and articulated a problem, painted its remedy with a broad brush, and eased the pain for taxpayers beyond the stated target in its statement of reasons. That does not convince me, beyond a reasonable doubt, of the nullity or invalidity of the statute; nor would I construe this as an unescapable ground to declare it invalid, any more than I would construe the interest and

dividends tax exemption under RSA 72:5 invalid for benefiting people who have no need for tax relief. I would suggest that, giving proper deference to the legislature on its factual findings and assessment of need and granting that the fashioning of the remedy is a uniquely legislative policy matter, a showing of necessity in the public interest for the time delay has been made.

The majority attacks the remedy fashioned by the legislature as too broad in light of the legislature's findings, not bearing a reasonable nexus to the perceived harm, and based on an unreasonable distinction. It reads the statutory statement narrowly to say that the harm is foreclosures, bankruptcies, and similar economic consequences. It reduces the affected class to a small number and concludes that the only distinction discernable is solely geographic.

Reading the statement with an eye to constitutionality, I would find it to say that the concern is economic impact of any degree caused by suddenly paying a new tax, not offset by a reduction in taxes. I would also find that the classes involved are those who will incur economic impact versus those who will see no adverse tax consequences. Presumably, taxpayers subject to the full $6.60 per thousand will receive an economic benefit of at least that much. There will be little or no economic impact on them. Those who are paying the new tax, uncompensated, may well be entitled to the temporary relief of the "phase-in." Thus, the classification is not purely geographic. The geography is incidental to the legislature's classification. The geographic element arises by virtue of our tax system. The legislature feared the impact of sharp tax increases and rationally moved to address this hardship.

### III. *Consistency with Good Faith Compliance at the Earliest Practicable Moment*

The legislature provided what it determined to be adequate funding for the schools of this State, and coming up with the money is a work in progress. The good faith and timeliness concerning us in this case is the five-year graduated phase-in of the full $6.60 per thousand statewide property tax and its application to donor town taxpayers. Again, granting proper deference to the legislature, I find no bad faith in this remedy and would hold that five years, albeit at the outside limit of reasonability, is within legislative discretion. *Compare Tenn. Small School Systems*, 894 S.W.2d 734 (five years approved) *with Green*, 391 U.S. 430 (fourteen years too long). The legislature said that five years is practical to remedy the perceived problem. I would hold that this is the earliest practicable date.

*IV. Management of State's Affairs under the Constitution*

Under our constitution, this is essentially a separation of powers issue. Whose call is the remedy? Under *Claremont II*, it was left to the legislature. This court's review is necessarily limited. As this court previously stated:

> It has always been the practice in this jurisdiction to follow the universally accepted doctrine that the constitutionality of an act passed by the coordinate branch of the government is to be presumed. It will not be declared to be invalid except upon unescapable grounds.

*Musgrove v. Parker*, 84 N.H. 550, 551, 153 A. 320, 321 (1931). The legislature is charged with creating a cure and has considerable latitude to effect a remedy. I would hold that the "phase-in" is consistent with the interest of the State in managing its affairs under the State Constitution. Accordingly, the proper branch of government, under the constitution, performed the management.

For the reasons stated, I respectfully dissent from the majority and would find the Act constitutional against the "phase-in" challenge.