NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by email at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: https://www.courts.nh.gov/our-courts/supreme-court

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Rockingham
Case No. 2024-0138
Citation: Rand v. State, 2025 N.H. 27


STEVEN RAND & a.

v.

THE STATE OF NEW HAMPSHIRE

Argued: November 13, 2024
Opinion Issued: June 10, 2025


John E. Tobin, Jr., of Concord, on the brief, Laflamme Law, PLLC, of Concord (Natalie Laflamme on the brief and orally), 160 Law, PLLC, of Concord (Andru Volinsky on the brief), Harter Secrest & Emery LLP, of Buffalo, New York (Michael-Anthony Jaoude on the brief), Education Law Center, of Newark, New Jersey (Wendy Lecker on the brief), and White & Case LLP, of New York, New York (Alice Tsier and Aditi Padmanabhan on the brief), for the plaintiffs.


John M. Formella, attorney general, and Anthony J. Galdieri, solicitor general (Anthony J. Galdieri and Samuel R.V. Garland, senior assistant attorney general, on the brief, and Anthony J. Galdieri orally), for the defendant.

Sheehan, Phinney, Bass & Green, PA, of Manchester (John-Mark Turner and Abbygale Martinen, on the brief, and John-Mark Turner orally), for the intervenor.

American Civil Liberties Union of New Hampshire, of Concord (Gilles R. Bissonnette and Henry R. Klementowicz on the brief) and National Education Association-New Hampshire, of Concord (Callan Sullivan and Lauren Snow Chadwick on the brief), as amici curiae.

McLane Middleton, Professional Association, of Manchester (Wilbur A. Glahn, III on the brief), for League of Women Voters of New Hampshire as amicus curiae.

American Institute for Economic Research, of Great Barrington, Massachusetts (Jason Sorens, non-lawyer representative, on the brief), as amicus curiae.

MACDONALD, C.J.

[¶1] In this case, the State and the intervenor, Coalition Communities (Coalition), appeal the Superior Court's (Ruoff, J.) ruling that the administration of the Statewide Education Property Tax (SWEPT) violates Part II, Article 5 of the State Constitution. See RSA 76:3 (2012); RSA 76:8 (Supp. 2024). We conclude that the legislature's decision to permit communities to retain funds raised by the SWEPT which exceed the cost to fund an adequate education does not implicate Part II, Article 5. Rather, it is an exercise of the legislature's spending power. Because there is no constitutional violation, we reverse the trial court on that issue. However, we agree with the trial court that the State's practice of setting negative local education tax rates in certain unincorporated places does violate Part II, Article 5, and we affirm on that issue.

I.  Background

[¶2] In 2022, the plaintiffs, individuals and entities owning real property in New Hampshire, brought this case. They seek, among other things, "a permanent injunction that requires New Hampshire to discontinue its unconstitutional public education funding scheme." The plaintiffs alleged that

"[b]ecause of the strategies employed by the property-wealthy towns to keep funds beyond those necessary to pay for the State's . . . cost of adequacy or to offset the SWEPT with negative tax rates, taxpayers in wealthy towns pay lower effective rates for this state tax, which violates the core constitutional principle that state taxes must be imposed at uniform rates." In its answer, the State admitted "that since 2011, communities for which the amount raised by the SWEPT exceeds the total amount of adequacy aid paid by the State have been permitted to retain the excess amounts raised by the SWEPT." Further, the State does not dispute that the department of revenue administration (DRA) "sets negative local education tax rates in a small number of communities to offset SWEPT revenues."

[¶3] The plaintiffs moved for partial summary judgment. The State and the Coalition each cross-moved for summary judgment. The trial court granted the plaintiffs' motion for partial summary judgment and denied the cross-motions of the State and the Coalition. The court found that "there can be no meaningful dispute that allowing communities to retain excess SWEPT funds lowers the effective SWEPT rate paid by those communities." Thus, the court concluded, "allowing some communities to retain excess SWEPT funds impermissibly results in a disproportionate tax rate, in violation of Part II, Article 5." In addition, the court found "that by setting negative local education tax rates in communities with little to no education expenses, the State is impermissibly reducing the effective SWEPT rate for those communities." In light of its rulings, the court enjoined the State "from permitting communities to retain excess SWEPT funds or offset the equalized SWEPT rate via negative local tax rates." The court directed that its order on the SWEPT issues be treated as a final decision pursuant to Superior Court Rule 46(c). This appeal followed.

II.    Analysis

    A.  Appellate Arguments

[¶4] On appeal, the State argues that the trial court erred because the "SWEPT rate is proportional and reasonable, equal in valuation and uniform in rate across the State, and just" and "therefore complies with Part II, Article 5." The State asserts that the so-called "'excess SWEPT' is nothing more than lawfully raised tax revenue," the appropriation of which does not implicate Part II, Article 5. The Coalition presents similar arguments. Moreover, the State argues, RSA 76:3 and RSA 76:8 "constitutionally classify the property subject to the SWEPT as the property in municipalities and thereby excludes the property in unincorporated places for just reasons." The Coalition takes no position on this issue.

[¶5] The plaintiffs counter that the trial court's decision that the administration of the SWEPT is unconstitutional should be affirmed as the trial

court "followed this Court's clear and repeated holdings." (Bolding and capitalization omitted.)  Further, they argue, the trial court "appropriately rejected" the contention that "this preferential tax treatment was a 'spending' decision and not simply a repetition of the previous schemes already struck down by this Court."  According to the plaintiffs, the position taken by the State and the Coalition "ignores the heart of this Court's prior rulings, which look beyond the facially uniform SWEPT rate to examine the reduced effective tax rate that is created when the excess SWEPT payments are not sent to the state, but instead are delivered to town coffers."  In addition, they argue that "the trial court correctly ruled that the State's practice of setting negative tax rates to offset SWEPT in unincorporated places violates Part II, Article 5." (Bolding and capitalization omitted.)

B.  Standard of Review

[¶6] A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits filed, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  RSA 491:8-a, III (2010).  In reviewing rulings on cross-motions for summary judgment, we consider the evidence in the light most favorable to each party in its capacity as the nonmoving party and, if no genuine issue of material fact exists, we determine whether the moving party is entitled to judgment as a matter of law.  Tremblay v. Bald, 176 N.H. 439, 442 (2024), 2024 N.H. 6, ¶8. We review the trial court's application of the law to the facts de novo.  Id.

[¶7] Because this appeal presents questions of constitutional law and statutory interpretation, our review is de novo.  Polonsky v. Town of Bedford, 173 N.H. 226, 230 (2020).  In matters of statutory interpretation, we first look to the language of the statute itself, and, if possible, construe that language according to its plain and ordinary meaning.  St. Onge v. Oberten, LLC, 174 N.H. 393, 395 (2021).  We give effect to every word of a statute whenever possible and will not consider what the legislature might have said or add language that the legislature did not see fit to include.  Id.  We also construe all parts of a statute together to effectuate its overall purpose.  Id.  However, we do not construe statutes in isolation; instead, we attempt to construe them in harmony with the overall statutory scheme.  Id.  When interpreting two statutes that deal with a similar subject matter, we construe them so that they do not contradict each other, and so that they will lead to reasonable results and effectuate the legislative purpose of the statutes.  Soraghan v. Mt. Cranmore Ski Resort, 152 N.H. 399, 405 (2005).

[¶8] In reviewing a statute, we presume it to be constitutional and will not declare it invalid except upon inescapable grounds.  Polonsky, 173 N.H. at 231.  Accordingly, we will not hold a statute to be unconstitutional unless a clear and substantial conflict exists between it and the constitution.  Id.  When

4

doubts exist as to the constitutionality of a statute, those doubts must be resolved in favor of its constitutionality.  Id.  The party challenging a statute's constitutionality bears the burden of proof.  Id.

C.  Excess SWEPT

[¶9] We first address the State's and the Coalition's arguments that the trial court erred by finding that by permitting municipalities to retain "excess SWEPT" funds, the State is violating Part II, Article 5.  For the purposes of this section, we put aside certain localities that are assessed negative local tax rates.

[¶10] In relevant part, Part II, Article 5 grants the legislature "full power and authority . . . to impose and levy proportional and reasonable assessments, rates, and taxes, upon all the inhabitants of, and residents within, the said state; and upon all estates within the same."  N.H. CONST. pt. II, art. 5.  "In order for a tax to be proportional, all property in the taxing district must be valued alike and taxed at the same rate."  Sirrell v. State, 146 N.H. 364, 370 (2001).

[¶11] The SWEPT is an education tax imposed on property across the state.  See RSA 76:3, :8.  Pursuant to RSA 76:3, the DRA sets the SWEPT tax rate "at a level sufficient to generate revenue of $363,000,000 when imposed on all persons and property taxable pursuant to RSA 76:8."  RSA 76:3.  For example, in tax year 2023, the SWEPT rate was $1.44 per thousand.  The DRA commissioner then "calculate[s] the portion of the education tax to be raised by each municipality by multiplying the uniform education property tax rate by the municipality's tax base."  RSA 76:8, I(b).

[¶12] A municipality's tax base is the "total equalized valuation of all property" in the municipality, as determined under RSA 21-J:3, XIII for the preceding year, less the value of certain qualifying utility and railroad property.  RSA 76:8, I(a).  To assess the amount calculated under RSA 76:8, I, the DRA commissioner issues "a warrant . . . for the amount . . . to the selectmen or assessors of each municipality . . . directing them to assess such sum and pay it to the municipality for the use of the school district or districts."  RSA 76:8, II.

[¶13] The department of education uses the SWEPT amount determined under RSA 76:8 to calculate education grant funds that are issued to municipalities.  See RSA 198:41, I (Supp. 2024).  RSA 198:41, I, provides:

> Except for municipalities where all school districts therein provide education to all of their pupils by paying tuition to other institutions, the department of education shall determine the total education grant for the municipality as follows:

(a) Add the per pupil cost of providing the opportunity for an adequate education for which each pupil is eligible pursuant to RSA 198:40-a, I-III, and from such amount;

(b) Subtract the amount of the education tax warrant to be issued by the commissioner of revenue administration for such municipality reported pursuant to RSA 76:8 for the next tax year; and

(c) Add the municipality's extraordinary need grant pursuant to RSA 198:40-f.

The grant funds are drawn from the education trust fund created under RSA 198:39. See RSA 198:42, II (Supp. 2024); RSA 198:39, II (stating that the education trust fund is funded from a variety of sources including business taxes, tobacco taxes, funds from the lottery commission, and appropriations from the general fund, among other things).

[¶14] By its plain language, RSA 76:8, II directs how SWEPT revenue must be spent. The statute requires each municipality's selectmen or assessors to assess SWEPT revenue and "pay it to the municipality for the use of the school district or districts." RSA 76:8, II (emphasis added). This is a paradigmatic legislative spending directive that, standing alone, does not implicate Part II, Article 5. That the scheme permits a locality to spend SWEPT funds beyond what is needed to fund the cost of providing the opportunity for an adequate education in that locality has no effect on the uniform SWEPT rate assessed to each taxpayer across the state. This scheme is materially different from other education property tax schemes that we have found to violate Part II, Article 5. See Claremont School Dist. v. Governor, 142 N.H. 462, 470 (1997) (Claremont II) (holding that an education property tax involving disproportionate tax rates between towns violated Part II, Article 5); Opinion of the Justices (School Financing), 142 N.H. 892, 899-902 (1998) (holding unconstitutional a proposed education tax scheme which subtracted, from the tax bills of taxpayers in "excess" communities, a special abatement in the amount of excess education tax revenue, thereby reducing the effective rate of the state tax for those taxpayers); Claremont School Dist. v. Governor (Statewide Property Tax Phase-In), 144 N.H. 210, 213-17 (1999) (holding that an education property tax scheme which phased in the full uniform tax rate over five years for certain towns, while imposing the full rate immediately on the remaining towns, violated Part II, Article 5).

[¶15] Nonetheless, the plaintiffs argue that certain data in the record "show[s] how the retention of the excess SWEPT operates to lower the effective SWEPT rate in the excess SWEPT communities." That data, compiled by a plaintiffs' expert, represents that the product of the SWEPT tax rate multiplied by the ratio of total adequate education cost to SWEPT funds raised is the

6

"Effective Equalized SWEPT Rate for Adequacy."  Following these calculations, the expert's data shows that Moultonborough's effective SWEPT rate is $0.44 per thousand while Hopkinton's effective SWEPT rate is $1.48 per thousand.

[¶16] However, there is no evidence in the record that these "effective rates" are actually paid by taxpayers.  The State Constitution requires that taxes, as "impose[d] and lev[ied]," must be "proportional and reasonable."  N.H. CONST. pt. II, art. 5.  The plaintiffs do not dispute that under the SWEPT, as administered, taxpayers are actually assessed at a uniform rate.  That concludes the constitutional inquiry.  The "effective rates" in the expert's data reflect, at most, an indirect effect of municipalities retaining excess SWEPT revenue, as the statutory scheme permits.  Theoretical indirect effects of the scheme on municipalities are not relevant to the analysis under Part II, Article 5.

[¶17] Accordingly, regarding the "excess SWEPT" issue, we hold that the SWEPT scheme is constitutional under Part II, Article 5 because it is "administered in a manner that is equal in valuation and uniform in rate throughout the State."  Claremont II, 142 N.H. at 471.  Therefore, we reverse the trial court's determination that retaining excess SWEPT violates Part II, Article 5 and vacate the trial court's grant of injunctive relief on this issue.

D. Negative Local Tax Rates

[¶18] We next address the State's argument that the trial court "erred in concluding that the DRA's practice of setting negative local education tax rates in a small number of unincorporated places renders the SWEPT's administration unconstitutional."  The State argues that RSA 76:3 and RSA 76:8 "classify the property subject to the SWEPT as the property in municipalities and thereby excludes the property in unincorporated places."  The State reasons that because "RSA 76:3 imposes an education tax 'on all persons and property taxable pursuant to RSA 76:8'" and "RSA 76:8 references only municipalities," RSA 76:3 and RSA 76:8 "do not impose the SWEPT on property in unincorporated places as a matter of law."  Further, the State asserts that under New Hampshire law, "an 'unincorporated place' is, by definition, not a municipality because it lacks the singular, necessary feature to make it a municipality: it is not incorporated."  Finally, the State argues that the legislature constitutionally exempted unincorporated places from RSA 76:8, II for "just reasons."

[¶19] We conclude that RSA 76:8 ("Commissioner's Warrant") and RSA 198:41 ("Determination of Education Grants") are part of the same overall statutory scheme, and thus construe them to be in harmony.  See St. Onge, 174 N.H. at 395.  RSA 76:8, II requires the DRA commissioner to calculate the portion of the education tax to be raised by a municipality based on its tax base and issue a warrant to the selectmen or assessors "of each municipality

7

. . . directing them to assess such sum and pay it to the <u>municipality</u> for the use of the school district or districts." RSA 76:8, II (emphases added). For the purposes of the "Adequate Education; Education Trust Fund" subdivision found within RSA chapter 198 ("School Money"), RSA 198:38 defines "municipality" to mean "a city, town, or unincorporated place." RSA 198:38, VI-a (Supp. 2024). The department of education is directed to determine the total education grant for each municipality. RSA 198:41, I. The grant total is determined by subtracting "the amount of the education tax warrant to be issued by the commissioner of revenue administration for such municipality reported pursuant to RSA 76:8 for the next tax year" from the total per pupil cost of providing the opportunity for an adequate education and the municipality's extraordinary need grant, if any. RSA 198:41, I(a)-(c).

[¶20] Keeping in mind the statutory definition of "municipality" — which includes unincorporated places, RSA 198:41, I, contemplates unincorporated places being subject to the SWEPT. Therefore, to read the statutes in harmony, unincorporated places must be encompassed within the term "municipality" in RSA 76:8. It would be anomalous for the legislature to exclude unincorporated places from the term "municipality" in RSA 76:8, while at the same time requiring the department of education to calculate grant totals for unincorporated places using the value of the education tax warrant issued for unincorporated places as part of the calculation.

[¶21] For these reasons, we conclude that the term "municipality" found in RSA 76:8 includes unincorporated places, and, therefore, that the legislature did not intend to exempt unincorporated places from the SWEPT. The remaining question is whether the DRA's practice of setting negative local education tax rates in unincorporated places violates Part II, Article 5. We hold that it does.

[¶22] The DRA sets tax rates for each locality's local education tax. <u>See</u> RSA 21-J:35 (2020). According to an affidavit submitted by a supervisor in the Municipal and Property Division of the DRA, the DRA sets a negative local education tax rate when a locality, generally an unincorporated place, has minimal or no public education costs in its budget and contains taxable property. Such a negative tax rate nearly or completely offsets taxpayers' SWEPT obligation in certain unincorporated places. For example, in 2021 the DRA set a local education tax rate for Hale's Location, an unincorporated place, at negative $1.84 per thousand, which, combined with Hale's Location's SWEPT tax rate of $1.85 per thousand, resulted in an effective property tax rate of $0.01 per thousand.

[¶23] The DRA's practice of setting negative local tax rates that nearly or completely offset the SWEPT rate in unincorporated places is in direct conflict with our conclusion that any statewide education property tax "must be

administered in a manner that is equal in valuation and uniform in rate throughout the State." Claremont II, 142 N.H. at 471; Opinion of the Justices (School Financing), 142 N.H. at 901 (stating that the obligation to contribute to the preservation of a free government "cannot be avoided or lessened by the mere circumstance of a town having few children"). Accordingly, we hold that the DRA's practice of setting negative local property tax rates that offset the SWEPT rate violates Part II, Article 5 and affirm the trial court's ruling on this issue.

[¶24] Finally, given our ruling, we conclude that the trial court's remedy — enjoining the State "from permitting communities to . . . offset the equalized SWEPT rate via negative local tax rates" — is unnecessary. Resolving the constitutional infirmity in the State's practice of setting negative local tax rates is the responsibility of the other co-equal branches of government. See Brouillard v. Governor and Council, 114 N.H. 541, 544 (1974) ("When the law is settled it will be obeyed."). Accordingly, we vacate the trial court's injunction remedy and remand for further proceedings consistent with this decision.

Affirmed in part; reversed in part; vacated in part; and remanded.

DONOVAN and COUNTWAY, JJ., concurred; BASSETT, J., concurred in part and dissented in part.

BASSETT, J., concurring in part and dissenting in part.

[¶25] I disagree with the majority's conclusion that permitting communities to retain excess SWEPT funds does not violate Part II, Article 5 of the State Constitution. To the contrary, when excess SWEPT funds are not sent to the State, but instead are retained by communities, the taxpayers' effective SWEPT rate in those communities is reduced and Part II, Article 5 is violated. I would affirm the trial court's order and, therefore, as to that issue, I respectfully dissent. I do, however, concur with the majority that the practice of setting a negative local education property tax rate to offset the SWEPT violates Part II, Article 5 of the State Constitution.

[¶26] As a threshold matter, I disagree with the majority when it asserts that the SWEPT "is a paradigmatic legislative spending directive that, standing alone, does not implicate Part II, Article 5." I reject the view that the SWEPT scheme is a "spending directive" immune from challenge under Part II, Article 5. Simply put, the legislature cannot "spend" funds that the State never collects. By the SWEPT scheme's plain terms, the State never actually collects any SWEPT revenue. See RSA 76:8, II (Supp. 2024) ("The commissioner shall issue a warrant . . . for the amount computed in paragraph I to the selectmen or assessors of each municipality . . . directing them to assess such sum and pay it to the municipality."). Each municipality raises and spends SWEPT

9

revenue locally, and no SWEPT revenue is sent to the department of revenue administration (DRA) for deposit in the education trust fund. Consequently, the SWEPT scheme is not a mere "spending directive." The SWEPT does, in fact, implicate the "power and authority . . . to impose and levy proportional and reasonable assessments, rates, and taxes" as granted to the legislature under Part II, Article 5 of the State Constitution.[1]

[¶27] In concluding that the SWEPT scheme does not violate Part II, Article 5, the majority states that the fact that communities retain excess funds "has no effect on the uniform SWEPT rate assessed to each taxpayer across the state." The majority further declares that "[t]heoretical indirect effects of the scheme on municipalities are not relevant to the analysis under Part II, Article 5." I disagree. The impact of the SWEPT scheme on taxpayers in excess SWEPT communities is anything but "theoretical" or "indirect": the effective SWEPT rate reduction those taxpayers enjoy is real and direct. The impact of the SWEPT scheme on taxpayers in other communities that do not generate excess SWEPT is also real and direct: those taxpayers enjoy no comparable reduction in their effective SWEPT rate. For example, retention of excess SWEPT monies results in an effective SWEPT rate of $0.44 per thousand in Moultonborough, as compared to an effective rate of $1.56 per thousand in Plymouth. This disparity in effective tax rates violates Part II, Article 5 and "is precisely the kind of taxation and fiscal mischief from which the framers of our State Constitution took strong steps to protect our citizens." Claremont School Dist. v. Governor, 142 N.H. 462, 465 (1997) (Claremont II); see also id. at 471 ("There is nothing fair or just about taxing a home or other real estate in one town at four times the rate that similar property is taxed in another town to fulfill the same purpose of meeting the State's educational duty.").

[¶28] We have stated that "effective tax rates" and the "practical effect" of a statewide education property tax scheme are critical to our analysis of whether a particular scheme violates Part II, Article 5. See Opinion of the Justices (School Financing), 142 N.H. 892, 899 (1998); Claremont School Dist. v. Governor (Statewide Property Tax Phase-In), 144 N.H. 210, 213 (1999) (Claremont III). Nonetheless, with little discussion, the majority abandons those principles and summarily declares that, because taxpayers are assessed at a uniform rate, "[t]hat concludes the constitutional inquiry." I disagree.

[¶29] In Opinion of the Justices (School Financing) and Claremont III, we determined that statewide education property tax schemes with facially uniform rates nonetheless violated Part II, Article 5 because they resulted in disproportionate tax rates. See Opinion of the Justices (School Financing), 142

---

[1] Perhaps the legal analysis would differ if any of the SWEPT funds were remitted to the department of revenue administration, deposited in the education trust fund, and then distributed to the municipalities. However, that is not the present scheme.

N.H. at 902; Claremont III, 144 N.H. at 212.  Each of those cases involved tax schemes specifically designed to reduce property taxes in communities that would retain excess education property tax revenue.  The tax scheme in this case has precisely the same purpose[2] — and exactly the same effect.  For the very reasons that those prior tax schemes failed to pass constitutional muster, so too the current SWEPT scheme fails.  I turn now to those cases.

[¶30] In Opinion of the Justices (School Financing), we reviewed a proposed education property tax scheme that "purport[ed] to establish a uniform State education tax rate based upon the equalized value of all taxable real property in the State."  Opinion of the Justices (School Financing), 142 N.H. at 899.  However, the bill authorized a "'special abatement' for the amount of state education tax apportioned to each town in excess of the product of the statewide per pupil cost of an adequate education times the average daily membership in residence for the town."  Id. (brackets and ellipses omitted).  The resulting special abatement value reflected the amount of education tax raised in excess of the cost of an adequate education for a given town.  See id.  The bill then directed the DRA "to calculate each town's tax by multiplying the State education tax rate by the total equalized value of property within it, less any special abatement."  Id.  We observed that "[a]s a result of the special abatement, the effective tax rate is reduced below the uniform State education tax rate in any town that can raise more revenue than it needs to provide the legislatively defined 'adequate education' for its children."  Id. (emphasis added).

[¶31] We concluded that "while the bill proposes a tax based on an equalized valuation and initially assigns a uniform rate, clearly some taxpayers would pay a far higher tax rate in furtherance of the State's obligation to fund education than others, due to the special abatement."  Id. at 902.  "Because such disproportionality is not supported by good cause or a just reason, it

_____

[2] RSA 76:8, II was amended by House Bill 337 in 2011 as follows:

>  The commissioner shall issue a warrant under the commissioner's hand and official seal for the amount computed in paragraph I to the selectmen or assessors of each municipality by December 15 directing them to assess such sum and pay it to the municipality for the use of the school district or districts **and, if there is an excess education tax payment due pursuant to RSA 198:46, directing them to assess the amount of the excess payment and pay it to the department of revenue administration for deposit in the education trust fund.** Such sums shall be assessed at such times as may be prescribed for other taxes assessed by such selectmen or assessors of the municipality.

N.H.H.R. Jour. 584 (2011) (bolding added).

To the extent there is any doubt about the purpose of this amendment, its legislative history demonstrates that its purpose was to "[e]liminate[] donor towns by allowing excess property tax revenues raised in a town to be used by the town." (Emphasis omitted.)

11

violates both the plain wording of Part II, Article 5 and the express language of <u>Claremont II</u>." <u>Id</u>. We further noted "that even if the bill provided for the actual collection of revenue raised through the uniform State education tax, and thereafter reimbursed certain qualifying taxpayers pursuant to the special abatement, our conclusions . . . would remain unchanged." <u>Id</u>. at 899. Notably, although the special abatement provision did not expressly alter the initially prescribed uniform tax rate, we nevertheless considered the special abatement's impact on the taxpayers' effective tax rate.

[¶32] In <u>Claremont III</u>, we considered a different tax scheme that phased in the full collection of excess education property tax funds over a period of five years. <u>Claremont III</u>, 144 N.H. at 213. The scheme established "a statewide tax 'at the uniform rate of $6.60 on each $1000 of the value of taxable property.'" <u>Id</u>. The tax scheme required that for "each municipality in which the education property tax exceeds the amount necessary to fund an adequate education, the excess must be remitted to the department of revenue administration." <u>Id</u>. However, the scheme also included a phase-in provision directing "municipalities to collect and remit to the department of revenue administration not more than the following percentages of the excess amounts: ten percent in tax year 1999; twenty percent in tax year 2000; thirty percent in tax year 2001; fifty percent in tax year 2002; seventy-five percent in tax year 2003; and 100 percent in tax year 2004." <u>Id</u>.

[¶33] Like the special abatement scheme in <u>Opinion of the Justices (School Financing)</u>, the <u>Claremont III</u> scheme utilized a facially uniform tax rate. However, that did not end our inquiry. We went on to examine the "practical effect" of the phase-in provision. <u>Id</u>. We stated that "[t]he <u>practical effect</u> of this phase-in is that in fifty 'property rich' towns across the State, the full rate of $6.60 per thousand is imposed gradually over five years, while taxpayers in the remaining towns pay the full rate immediately." <u>Id</u>. (emphasis added). Further, we heeded "the words of Chief Justice Doe written more than one hundred years ago: 'A state law selecting a person or class or municipal collection of persons for favors and privileges withheld from others in the same situation . . . is at war with a principle which this court is not authorized to surrender.'" <u>Id</u>. at 217 (quoting <u>State v. Griffin</u>, 86 N.H. 609, 614 (1894)). We observed:

> In this case, the classification at issue imposes a State tax on property at different rates for five years based solely on the location of the property. We can find no case where different rates of taxation exist in a State tax from one municipality to another. We can conceive of none that would pass muster under the words of Chief Justice Doe or the provisions of Part II, Article 5.

<u>Id</u>. We held that the scheme "violate[d] Part II, Article 5 of the State Constitution in that the varying property tax rates are unreasonable and

12

disproportionate." Id. at 216-17. The bottom line is that our cases dictate that we look beyond the SWEPT's facially uniform rate and examine the practical effect of the present scheme on taxpayers. I do so here.

[¶34] The DRA's formula for calculating the local education property tax rate is revealing. It is through application of this formula that excess SWEPT communities receive direct property tax relief as a result of the SWEPT scheme. Under the formula, the excess SWEPT dollars that are retained in the community reduce the amount of additional funds that are needed to fund a community's school budget, thereby reducing the total amount needed to be raised by local education property taxes.

[¶35] To be sure, I agree with the majority that the SWEPT rate is facially uniform and that the SWEPT is assessed and collected from the taxpayers in full. But, as in our earlier school funding cases, that does not end the inquiry. In terms of practical effect, the tax scheme at issue in this case does not differ materially from the scheme in Claremont III.[3] It matters not whether the economic benefit for taxpayers in excess SWEPT communities is achieved through a direct rebate, a reduction in the SWEPT rate, or retention of SWEPT funds that ultimately reduces the amount to be raised through local education property taxes — these are merely different means to achieve the same ends. The majority looks past the fundamental economic reality that money is fungible, and that when communities retain excess SWEPT revenue, the local education tax rate is reduced — and the overall property tax burden for the taxpayers in those communities is likewise reduced. The "effective rate" of the SWEPT is therefore reduced. That, of course, is the purpose — and "practical effect" — of the scheme. And that is why the SWEPT scheme is untenable and violates Part II, Article 5. See Claremont III, 144 N.H. at 213. To conclude otherwise is an unfortunate triumph of form over substance.

[¶36] Affidavits in the record from various town administrators clearly evidence the practical effect of the scheme — the benefit that the excess SWEPT communities and their taxpayers enjoy by virtue of retaining excess SWEPT revenue. By way of example, the town administrator in Waterville Valley stated in an affidavit that if the town is required to remit excess SWEPT revenue to the State, "it will have very harmful effects on our small community." Referencing town projects such as a new wastewater treatment

---

[3] The statutory "phase-in" language in Claremont III is ambiguous. It can be read to mean that towns subject to the phase-in do not collect the amount of excess revenue beyond the increasing percentages of remitted excess dollars. Or, it can mean that those towns collect the full amount and remit increasing percentages of the excess each year, retaining the balance of the collected funds. If the latter interpretation is correct, Claremont III would clearly control the outcome in this case and require this court to declare the current SWEPT scheme unconstitutional. Even under the former interpretation, Claremont III instructs that we must look to the practical effect of the scheme on taxpayers.

13

plant, drinking water operating costs, and reconfiguration of the town's solid waste transfer station, the administrator concluded that "the Town cannot absorb another annual $500,000 loss of revenue without either cutting school funding, cutting vital Town projects, or increasing taxes."

[¶37] The town administrator in Moultonborough made a similar observation. The administrator stated in an affidavit that if the town is required to remit excess SWEPT funds, "it will set completion of the Town's projects back years, increase taxes for our residents, take away resources and limit our ability to provide public services for our community, residents, taxpayers, and the children that attend our schools." The administrator specifically identified a planned sewer line expansion that would be jeopardized if the town is "required to make up the difference for the excess SWEPT funds."

[¶38] These affidavits demonstrate the undeniable reality that the excess SWEPT funds retained by towns are fungible and work to reduce effective tax rates and the overall tax burden of taxpayers in those towns. It is simply a matter of mathematics: but for being able to retain excess SWEPT funds, communities would need to increase local property taxes or make budget cuts to account for the revenue shortfall. The inescapable conclusion is that retention of the excess SWEPT funds has the practical effect of reducing the local property tax rate — and the tax burden as a whole — for taxpayers in excess SWEPT communities. The resulting disproportionate effective SWEPT rates result in the SWEPT scheme violating Part II, Article 5.

[¶39] Turning to the SWEPT scheme as implemented in unincorporated places, I agree with the majority that the DRA's practice of setting negative local education property tax rates to offset the SWEPT violates Part II, Article 5. In fact, this practice is a paradigmatic example of a Part II, Article 5 violation: the SWEPT rate is facially uniform in unincorporated places, yet the "effective rate" is zero, or close to it, when the negative local education tax is taken into account. The formula utilized by the DRA that yields the negative local education tax rate for unincorporated places is the same formula that the DRA applies when determining local education tax rates for all other municipalities. The practical effect of the DRA's rate-setting practice as it relates to unincorporated places is that property located in an unincorporated place with minimal or no public education costs in its budget is not subject to the SWEPT. We have previously stated that the obligation to contribute to the preservation of a free government "cannot be avoided or lessened by the mere circumstance of a town having few children." Opinion of the Justices (School Financing), 142 N.H. at 901. The DRA's practice that permits property in unincorporated places to avoid being subject to the SWEPT is unjust and unreasonable — and unconstitutional. Accordingly, I agree with the majority that the practice violates Part II, Article 5.

14

[¶40] In sum, "it is basic to our collective well-being that all citizens of the State share in the common burden of educating our children." Id. at 902. The SWEPT scheme relieves taxpayers in excess SWEPT communities and unincorporated places in the State from fully sharing in this common burden. I would hold that, because the SWEPT scheme is not "administered in a manner that is equal in valuation and uniform in rate throughout the State," it violates Part II, Article 5. Claremont II, 142 N.H. at 471.